# Decisions of the Supreme Court of Missouri,

## ST. LOUIS DISTRICT, MAY TERM, 1828.

### MARGUERITE v. CHOUTEAU.

Indians taken captive in war, prior to the year 1769, by the French, and held or sold as slaves, in the province of Louisiana, while the same was held by the French—held to be lawful slaves; and if females, their descendants likewise. (Note a.)

IN ERROR from the St. Louis Circuit Court.

Opinion of TOMPKINS, J.*

This is an action of trespass, assault and battery, and false imprisonment, brought by the appellant against the appellee, to recover her freedom.

On the trial, the following facts appeared in evidence: Madame Chauvin deposed, that Marguerite, the plaintiff, appellant here, was born in the year 1778; that the name of her mother was Marie Jean, sometimes called Marie Scipion, who belonged to and lived with Joseph Tayon, the deponent's father; that the mother of the appellant was in possession of deponent's father from the time of his marriage until January, 1801, when she was removed sick from the house of Mr. Chouteau (where Tayon then lived) to the deponent's house, where she died in June, 1802, aged about 60 years; that the deponent had heard from her father and mother, that Marie Scipion was bought by deponent's grand mother, and given to her mother; that she had heard from the same, that Marie Scipion was the daughter of an Indian woman captured by the French near Natchez, and brought to Fort Chartres, where she was sold as a slave; that a negro man named Scipion was supposed to be the father of Marie Scipion; that the deponent has heard this from others than her father and mother; (72) that the deponent's father had an Indian woman named Marie Louise, who had

*Absent, Judge M'Girk.

53

two male children, Akin and Julien, who ran away and passed for freemen at the commencement of the Spanish Government; that they went to New Orleans after the publication of an ordinance of O'Reilly, the Spanish Governor of Louisiana, "declaring all the Indian slaves, then in the province of Louisiana, free at the death of their master, and those born after the publication, free at their birth, prohibiting any sales by any persons then in possession of such slaves; that the deponent read the ordidance to her father, and conversed with him on the risk he ran of losing his Indian slaves, and that she remembers he sold one of these slaves, and was compelled to take it back and hush it up, lest he should be fined under the ordinance; that she remembered to have heard her father say, after the publication of the ordinance, that Marie Scipion and her children would be free at his death, in consequence of that ordinance.

Jean B. Reviere's deposition contained about the same account of the descent of Marie Scipion.  He knew her at Fort Chartres, when she was about 18 or 20 years old; had heard his deceased father say, that the mother of Marie Scipion was of the Natchez tribe of Indians; that he had heard Joseph Tayon, in his life time say, that Marie Scipion was given to him by one Guyon, on condition that she and her children should be free at the time of the death of Tayon and wife.  This witness also speaks of the publication of O'Reilly's proclamation, with this difference, that it was thereby declared that all Indians then held in slavery, should be forthwith set at liberty, and be allowed to remain in the settlements, or to return to their own country, at their own option; he further states, that many Indians, then held in slavery, were set at liberty, in pursuance of this proclamation.  He also deposes, that two sons of Marie Louise left the service of Joseph Tayon, and went to the lower country.  He also states, that he understood Joseph Tayon to say, that Marie Scipion lived in his family of her own free will and consent, because she was well treated and chose to remain with him, and that the said Marie Scipion and her children were at liberty to leave him at any time they pleased, but if they chose to remain till his death, they should never serve any body.

The deposition of Marguerite Reviere states, that Marie Scipion was descended from an Indian woman of the Natchez tribe; that it was the public opinion that she and her children could not be slaves, being of Indian blood.  She also testifies as to the publication of O'Reilly's proclamation, and says, that Indians before held in slavery, were immediately set free.

(73)    Francis Dorlac's deposition gives the same account of Marie Scipion's descent; mentions the publication of O'Reilly's proclamation in terms equivalent to those used by the two last witnesses; that slaves of several persons were set at liberty under that proclamation, immediately after its publication.

Several other witnesses were examined, who told nothing more than had before been given in evidence.

John B. C. Lucas, a witness examined by the plaintiff, testified, that about twenty years ago, the witness being then a Judge of the Superior Court of the Territory of Missouri, there was a suit in that Court betwixt the children of Marie Scipion and Joseph Tayon, that the present plaintiff Marguerite was probably one of the parties; that in this suit, the pedigree of the defendants in that Court, came directly in question.  The question then was, whether the then defendants and others were descended in the maternal line from an Indian woman.  The witness then heard Antoine Reviere state, that Marie Scipion's mother was an Indian woman of the Natchez tribe;

Marguerite *v.* Chouteau.

that she was brought to Fort Chartres after the defeat of the Natchez Indians by the French, about the time of the massacre as it was called; that the father of Marie Scipion was a negro man; that when the mother of Marie Scipion was brought to Fort Chartres, he was a very young man, too young to go to hunt or to war; that Pierre O. Becket, another witness then examined, gave a similar account of the descent of Marie Scipion, and that he saw her in the situation of a servant in the kitchen of Mr. Tayon, but knew nothing of her freedom or slavery. Madame Cochon, a witness, who testified on that trial on the part of Tayon, stated, that Marie Scipion was the daughter of a negro woman.

Objections were made by the defendant in the Circuit Court (appellee here) to reading to the jury those parts of depositions of Madame Chauvin, of Jean B. Reviere and of Dodier, which relate to the publication of O'Reilly's proclamation, and they were sustained by the Court.

The following is so much of the defendant's testimony, as I think material to be noticed. Sebastian Pratte deposed, that in 1756, or 1757, he went to Fort Chartres in Illinois, and lived in the family of Joseph Tayon, above mentioned : that in the first year of his residence with Tayon, he observed in the family a negro woman named Mary, an Indian woman called Marie Louise with her two children, and a girl called Scipion, about ten or twelve years of age, treated and well known as a slave; that he (74) knew her in Tayon's possession for several years after his removal to St. Louis; that he did not know the mother of Scipion; that there were at Fort Chartres, and elsewhere through the country, a great many Indian slaves and but few blacks; that the Indians were universally acknowledged as slaves, and frequently sold as such before the Governor; that he himself sold one to the Commandant; that the Commandant he speaks of, was the English Commandant at Kaskaskia; that from his belief of the character of Mr. Tayon, he is certain he would not have sold a person as a slave who was not so; that a majority of the Indians held as slaves, were brought down the Missouri by the traders, and were of different nations; that there were many Indian slaves in St. Louis after its first establishment, and but few blacks.

The counsel for the plaintiff objected to the reading of those parts of the deposition which relate to the existence of Indian slavery in Illinois and Louisiana, and to the number of Indian and black slaves; which objection was also overruled by the Court.

The deposition of Auguste Chouteau stated, that the deponent had long known Marie Scipion; always understood her to be the daughter of a negro woman, slave to Mr. Guyon, which Mr. Guyon gave to his relation; that " at the arrival of the Spanish Government " he heard there were many slaves of Indian blood, and *after* (" *often* ") of the mother's side.

The plaintiff objected to reading such parts of said deposition as relates to the number of Indian slaves in the country, and to the giving of Marie Scipion to Tayon, by Guyon, and the Court overruled the objection.

The deposition of Madame Dubrieul stated, that Marie Scipion was of negro blood; that she was the mother of Marguerite; and that she knew an old Indian woman named Marie Louise, who remained a slave to Tayon till the Spanish Government declared her free; that many Indian slaves remained with their masters after they were so declared. Two other depositions read by the defendant in the Circuit Court contain no new matter.

Marguerite v. Chouteau.

The plaintiff then prayed the Court to instruct the jury,

First. That if the jury find from the evidence that the ancestor of the plaintiff, in the maternal line, was an Indian woman, they must find for the plaintiff.

Second. That if the maternal ancestor of the plaintiff was taken as a prisoner in war, she did not thereby become a slave.

(75) That heresay evidence is not competent to prove the fact, that the maternal ancestor of the plaintiff was taken a prisoner of war.

Fourth. That evidence of maternal ancestor of the plaintiff being held as a slave during the French Government of Louisiana, does not establish the legality of the slavery in which the plaintiff may be held.

Fifth. That no practice of enslaving Indians during the time that Louisiana belonged to the French, is evidence that such practice was sanctioned by law.

Sixth. That a prisoner of war cannot be reduced to slavery, unless under such circumstances as would authorize putting him to death, and that unless evidence of such circumstances is given to the jury, they must consider such slavery, under the pretence of the ancestor of the plaintiff being taken a prisoner in war, as illegal.

Seventh. That the right to hold a prisoner of war in slavery continues no longer than the political necessity exists for such enslaving, and that when such necessity ceases, the prisoner can no longer be held in slavery.

All of which instructions the Court refused to give.

The defendant then asked of the Court the following instructions:

First. If the jury find from the evidence that the maternal grand mother of the plaintiff was an Indian woman of the Natchez nation, taken captive in war by the French, and that she was held and sold as a slave in the province of Louisiana while the same was held by the French, and prior to the year 1769—she and her descendants ought to be considered as being lawful slaves.

Second. If the jury find from the evidence that the maternal grand mother of the plaintiff was an Indian woman taken captive in war by the French, and was held or sold as a slave in the province of Louisiana while the same was held by the French, and prior to the year 1769, she and her descendants ought to be considered by the jury as being lawfully slaves.

Third. If the jury find from the evidence that the maternal grand mother of the plaintiff was an Indian woman taken captive in war by the French, and was held and sold as a slave in the province of Louisiana while the same was held by the French, and prior to the year 1769, she and her descendants ought to be deemed by the jury as being lawfully slaves.

Fourth. If the jury find from the evidence that the maternal grand mother of the (76) plaintiff was an Indian woman taken captive in war, and held as a slave in the province of Louisiana while the same was held by the French, and prior to the year 1769, she and her descendants ought to be taken by the jury to have been lawfully slaves.

Fifth. If the jury find from the evidence that the maternal grand mother of the plaintiff was a negro or Indian woman, and that she was held as a slave in the province of Louisiana while the same was held by the French, and prior to the year 1769, she and her descendants ought to be taken by the jury to have been lawfully slaves.

Sixth. That the declaration of Joseph Tayon, as testified to by John B. Reviere in his deposition, do not, in law, operate to emancipate said Marie Scipion.

Marguerite v. Chouteau.

or any of her children, *nor is the plaintiff entitled to her freedom in consequence of said declarations.*

Seventh. That Indians taken in war *might lawfully be held as slaves* in the province of Louisiana *while the same was held by the French,* and prior to the year 1769.

Eighth. That Indians might lawfully be reduced to, and held in slavery in the province of Louisiana while the same was held by the French, and prior to the year 1769.

All of which instructions the Court gave.

It is assigned for error: First. That the Circuit Court refused to give each and all of the instructions prayed for by said Marguerite. Second. That the Circuit Court gave the jury each and all of the instructions asked for by Chouteau. Third. That the Circuit Court rejected the evidence of O'Reilly's proclamation contained in the deposition of Madame Chauvin and others. Fourth. That the Circuit Court admitted the evidence contained in the deposition of Pratte of many Indians being held in slavery in Louisiana, and admitted other evidence objected to by said Marguerite.

On the part of the plaintiff it is contended, first, that all Indians unquestionably are at least *prima facie* free, and 1 *Wash.* 123; 1 *Hen. & Mun.* 133; and 2 *Hen. & Mun.* 157; and Vaughan *v.* Phebe, a Tennessee case, are relied on.

Raynal, Brackenridge, and Marshall's life of Wasnington, are cited, to show that the French Government treated with the Indian nations bordering on their colonies in North America as independent nations, contending that they stood in the same relation to the French colonies, that the neighboring tribes did to the British colonies; while on the other hand, all negroes imported into North America were brought in as slaves; thence it is concluded, that in Louisiana, as in the late British colonies, negroes ought to be held *prima facie* slaves, and Indians *prima facie* free.

(77) If Indians were only *prima facie* free under the French Government in Louisiana, then it is contended that hearsay evidence is not sufficient to prove that the plaintiff's maternal ancestor was taken a prisoner of war; 7 *Cranch* 290, is relied on.

Third. It is contended that even though it were proved that the plaintiff was a prisoner of war, yet still, as the French regarded Indians as independant nations, the law of nations applies to them, and that they could not, agreeably to that law, be held in slavery no longer than the necessity for so holding them existed; Vattel is cited—the pages of Vattel and Raynal referred to, contain no such matter in the editions which have fallen into my hands.

Mr. Spalding, on the part of the appellee, contends—

First. That slavery of Indians was legal under the French Government of Louisiana, because, first, there is no distinction naturally between ("nations" perhaps,) to entitle some to the exemption from the possibility of being made slaves, and in all or most of the English colonies in early times, the same state of facts as has appeared in this case, would, had it existed with respect to an African, have unquestionably held him in slavery. If, in those colonies, the fact that negroes were held as slaves, and bought and sold as such in the absence of all written law, was considered as proof of the law, as it seems to have been held, why should not the same principle apply to Indians? and he cites 3 *Martin* 285; 1 *Tucker's Bl.* 2d part, app. 45, and 1 *Dallas* 167.

Second. The fact, he continues, whether slavery of negroes or Indians existed lawfully in French Louisiana does not depend on the consent of many nations to make slaves of them; it depends on the municipal law of that province. That law can-

Marguerite *v.* Chouteau.

not be presumed to have been written, for slavery has not any where commenced by written law. Whether Indians were slaves by law, therefore, is to be gathered from facts and circumstances, decisions of Courts, &c. Indians were generally held as slaves in Louisiana, and treated.as such. A whole tribe, to-wit: the Natchez, were captured and held and sold as slaves. There were a great many Indian slaves at the time the Spanish authorities took possession of the country. In the margin here are cited the depositions: History of Louisiana by Le Page Du Pratz, 258, 326; Raynal's Indies, vol. 8, 143.

Third. The proclamation of O'Reilly, meaning the proclamation made in 1769, forbidding Indians to be held in slavery for the future, became a law of the land, and strongly fixes the legality of Indian slavery. The Court being bound *ex-officio* to (78) know the law of the land, will inform itself whether such proclamation ever existed, what was its tenor, &c. ; and it has a right.to look into the excluded parts of the depositions in this case, where will be found ample proof of the promulgation of the proclamation, the tenor of which has, however, been misconceived by the witnesses, through ignorance and length of time. As evidence of the unwritten law of the land upon the subject of Indian slavery, the cases cited in *Martin's Reports* of the decisions of the Baron de Carondelet have great weight, being the judicial decisions of the highest authority in the province.

Fourth. If Indian slavery was legal under the French Government of Louisiana, the presumption unquestionably arises *now* as it did then, that an Indian whose maternal ancestor has been held as a slave till death, is a slave; he here cites from 3 *Martin*, in the case of Seville *v.* Chretien, in which the Court decided that the freedom of Indians held in slavery under the French Government in Louisiana, was not acquired under the Spanish Government, and that Indian slavery was lawful under the French Government there. The counsel for the appellee then contends that those parts of the plaintiff's deposition which relate to the publication, contents and effects of O'Reilly's proclamation, were properly excluded from the jury by the Circuit Court, that no foundation was laid for the admission of parol evidence to prove the contents of a written instrument. Furthermore, that the proclamation, if such an one had ever been made, became the law, and the Courts of this State are bound *ex-officio* to know its contents and meaning; and it was ("not") competent to prove by witnesses to the jury what the Court was bound to know, and to declare to them judicially as a part of the law of the case and of the country at a former period. But the record states that those declarations were excluded which relate to, or speak of, or concerning the publication, contents and effects of a proclamation, &c. Now the effects of the law (for that proclamation was law) cannot be adduced to prove to a jury what that law was, particularly where it was written law, and was not produced; but he contends that the plaintiff's objections to the depositions of Pratte and Chouteau, before mentioned, were not good, "because the existence *de facto* of Indian slavery, and its extent in Louisiana, is evidence in this case for the purpose of showing the strength of the presumption to be raised against .the freedom of Marguerite. The more Indians there were legally held in slavery, the greater the probability that Marguerite's ancestor was one of them. Again the defendant had (79) the same right to read this part of said depositions, that he had to read an authority in law to the jury. The sixth instruction asked by the defendant and given by the Court, raises the question whether the verbal declaration of the owner of a slave could emancipate such slave under the Spanish Government." The *Partidas*

Marguerite *v.* Chouteau.

is cited to show that emancipation was required to be performed in a more ceremonious way than by our laws at present. The points arising in this case, and which seem to me necessary to be decided on, are:

First. Whether the Court erred in rejecting the evidence of the publication, contents and effects of the proclamation of O'Reilly, the Spanish Governor, as testified by the appellant's witnesses.

Second. Whether the Court erred in permitting to go to the jury, those parts of the depositions of Sebastian Pratte and Auguste Chouteau, that mention the number of Indian slaves held in Illinois and Louisiana, and of such parts of the deposition of said Pratte as mention the number of Negroes in said country, and of the sale of Indian slaves.

Third. Whether the Court erred in permitting to go to the jury, that part of the deposition of Auguste Chouteau, which mentions that he had heard that Marie Scipion was a gift from Guyon to Tayon.

Fourth. Whether Indians might be lawfully reduced to slavery under the French Government of Louisiana.

Fifth. Whether Indians of the Natchez tribe might lawfully be reduced to slavery under the French Government of Louisiana.

Sixth. Whether the declarations of Tayon, as testified to by J. B. Reviere, operate to emancipate Marie Scipion.

Seventh. Whether, under the French Government in Louisiana, negroes might lawfully be held in slavery.

First. The evidence of the publication, contents and effects of O'Reilly's proclamation, was, I think, properly rejected. If we consider it as a matter of fact, no foundation, as was observed, has been laid for proving the contents of a written instrument. If we regard it as law, it was not a subject matter, proper to be contained in a deposition, for the ears of a jury.

Second. The evidence of Pratte and Chouteau, concerning the existence and extent of Indian slavery in Louisiana, regarded as a matter of fact, was, I think, wholly immaterial; the issue here is, whether Marguerite be free or a slave; she cannot be supposed to be prepared to contend whether other Indians were lawfully held in (80) slavery, and her case is not to be prejudiced by theirs. But it is contended that the defendant has the same right to read this part of the depositions, that he had to read an authority in law to the jury. Now the existence and extent of Indian slavery (if that slavery were lawful) would rather be the effect of *the law* than the law itself; and the defendant's counsel has before said that the *effects of the law* cannot be adduced to prove to a jury what the law is, particularly when it is a written law. I am at a loss to see why the law, whether written or unwritten, comes before the jury in the form of a deposition. *Blackstone,* in the first volume of his Commentaries, page 63, says, "with us, at present, the monuments and evidences of our legal customs are contained in the records of the several Courts of justice, in books of reports and judicial decisions, and in the treatises of learned sages of the profession, preserved and handed down to us from the highest times of antiquity."

In all civilized countries, Courts, I think, ought to require that the person who tells them of the existence of a law, should be in a situation in life to know what is the law. It is not pretended that the witnesses were learned sages of the law, and if they had been such, the course I think would have been to introduce them into Court, to prove the law to the Court and not to the jury. But it is evident the ob-

ject of the appellee is to induce the Court to presume a law from the existence of certain facts, and with these facts, in my opinion, the jury have nothing to do ; therefore, I think, the testimony should have been rejected.

Third. Whether Marie Scipion were given by Guyon, if material in this case, ought to have been proved by other evidence than hearsay.

Fourth. In order to establish this point, the appellee contends that there is naturally no distinction among the nations of the world, to entitle some to exemption from the possibility of being made slaves, and that in all or most of the English colonies, in early times, the same state of facts as has appeared in this case in relation to an Indian, would, had it existed with respect to an African, have unquestionably held him in slavery. If in these colonies, he continues, the fact that negroes were held as slaves, and bought and sold as such, in the absence of all written law, was considered as a proof of the law, why should not the same principle apply to Indians. Here he cites *Martin's Reports*, vol. 3, p. 285 ; 1st vol. *Tucker's Bl.* p. 2d, page 45 and 46 of the app. ; 1 *Dallas*, 167. *Judge Tucker*, in the 45th page cited, says that negroes were first introduced in Virginia in 1620 ; in the 46th, (81) that an act was passed prohibiting Indians or negroes manumitted, &c., from purchasing Christian slaves. From this act, he says, it is evident that Indians had before that time been made slaves, as well as negroes, though we have no traces of the original act by which they were reduced to that condition ; strongly insinuating, I think, rather that the act was lost than that none had ever been passed. In Virginia, where a statute authorizing the reducing of Indians to slavery existed, still Indians were *prima facie* free, and negroes were *prima facie* slaves : see 1 *Hen. & Mun.* 133, Hudgins *v.* Wrights. For this distinction there is a very good reason. Negroes were imported into Virginia and sold as slaves, under the authority of the Crown of England, from a very early period till the year 1778, at which time Virginia became independent. The enslaving of Indians was authorized but for a very short time, and the Courts required the persons claiming property in an Indian, to prove that such Indian was enslaved agreeably to law. The same author quoted by the appellee, tells us in a few pages after, that " it is easy to trace the desire of the Legislature to put a stop to the further importation of slaves, and had not this desire been uniformly opposed on the part of the Crown, it is highly probable that event would have taken effect at a much earlier period than it did." The Portuguese, the Spaniards, the Hollanders, the English, the French, and Danes, all carried on the slave trade in Africa. For this purpose their respective governments established military posts and incorporated companies : see *Raynal*, book 11, chap. 20 ; and yet we are told there is no legislative act to authorize negro slavery. It might be asked whether any legislative act were necessary to authorize the sovereign power of a State to do any act it pleases. The King of France, at least, could not think it necessary to make a law to authorize himself to carry on the slave trade ; for this he literally did by incorporating companies to do so, inasmuch as the company was his agent, supported by his arms. *Raynal* says, " L'etablissement qu'ills formerent a cette epoque dans le Senegal, dut en 1678 quelqu' accraisement a la terreur qu' imprimaient alors les armes victorieuses de Louis XIV ; (the establishment about that time made in Senegal, owed something in 1678 to the terror then impressed by the victorious arms of Louis XIV.) We have the authority of Judge Tucker, that the Assembly of Virginia was restrained by the Crown of England from prohibiting the

Marguerite v. Chouteau.

(82) importation of African slaves. What power then could be expected to resist the King of France in Louisiana?

It is in my opinion quite immaterial whether the subjects of the European powers first began to trade in slaves to Africa, and were afterwards supported by their respective sovereigns, or whether the sovereigns first authorized the trade. The assent of the government is clearly given to the African slave trade, while no such commerce in Indian slaves is authorized by any act of theirs. The implied assent relied on by the appellee, amounts to nothing; as well might it be pretended one hundred years hence, that murder was at this present time lawful in Missouri, because some persons had killed others, and had not been punished for the act. Governments do not impliedly assent to a violation of the laws of nature. We know the laws of a polished nation, such as France, from her statutes, the decisions of her Courts of Justice, and the acts of the Executive power. But the French Government, we are told, sent three hundred Indians of the Natchez tribe, as slaves, into St. Domingo. This only proves the will of the French Government to enslave those three hundred Indians; and the fact of their being sent off the continent, appears to me to be strong evidence that the Government never had been accustomed to enslave Indians in the province of Louisiana.

Du Pratz tells us that the Natchez had been very useful and friendly to the French. The author himself had lived at the post, and gives a very particular account of the war and capture of that tibe. Chepart, he tells us, had been removed from the command of the post, for acts of injustice done by him. Perier arriving at New Orleans shortly after, as Commandant General of Louisiana, suffered himself to be imposed on by Chepart's plausible manners, and restored him to his command, which, says the author, never would have been done had Perier known him well, " L'integrete de ce commandant general lui aurait ete un obstacle insurmountable." Chepart, restored to his post, commenced a new course of oppression and tyranny. The Natchez, driven to desperation, determined to exterminate the French ; very few of those at the post escaped being either made prisoners or butchered. Many other outrages were committed. The French under Loubois, marched against them and beseiged them in their town ; the Natchez, hard pressed, sought and obtained conditions: they surrendered the prisoners they had made, and in the night made their escape and recommenced hostilities in the most outrageous manner. The author observes that the (83) Natchez at the time of their escape, had good reason to fear the French on account of the black act they had done, but that they feared still more the Chatkas ; they did not doubt that the French would excuse them for the murder of their countrymen, in consideration of the tyranny of the French commandant: but they feared the accustomed insolence of the Chatkas, who would have stripped them naked, and insulted them even in the presence of the French. And it was certainly this fear which determined them to escape during the night. Some time after, Perier marched in person against them and beseiged them. The Natchez again demanded a capitulation; but they started difficulties, which occasioned messages to be sent ("des allees et des venues,") till night, which they waited to profit by it, by demanding till the next day to draw up the articles of capitulation. The night was allowed them ; but they were so watched that they could not escape, as in the war of Loubois ; they, however, made the attempt, but failed, a small number escaped and retired to the Tchickachas. The rest surrendered at discretion. They were sent to the Island of St. Domingo, says the author, that the nation might be extinct in the colony. From

this account of this affair, taken from the author cited by the appellee, I am inclined to think that the French considered themselves justified by the circumstances of the case, in reducing the Natchez to slavery. It was evidently a war of extermination on the part of the Natchez. The allied powers of Europe lately confined Napoleon to the Island of St. Helena, because he was, as they affected to believe, dangerous to their government, and yet it never was contended that each Englishman had a right to imprison in his own house a Frenchman, because his government had concurred in imprisoning the Emperor of the French, in St. Helena.

We may further observe, that Perier did not seem inclined to treat them with so much harshness, till they had again made an attempt to escape, after asking and obtaining a capitulation. For such conduct as that of the Natchez towards the French, a civilized nation might, perhaps, in modern times, have been refused quarter. *Vattel* says, B. 3, Cap. 8, sec. 152, that prisoners of war may be made slaves in cases which give a right to kill them. " But this disgrace of mankind," he afterwards adds, " is happily extinct in Europe." Another page of Du Pratz was referred to, erroneously I suppose, as the author says nothing there, or in any other part of that (84) volume, about Indians enslaved by the French. This book is rarely found, and the other volumes have not been within my power.

I cannot notice the passage referred to in Raynal, because the edition used by the counsel has not been given to me, and that in my possession must be differently paged. I have carefully read over Raynal's account of the establishment of the French on the continent of North America, and have been able to find nothing to justify a belief, that the French Government ever reduced Indians to slavery, either in Canada or in Louisiana. In chap. 8, of book 15, the author gives the account of the capture of the Iroquois chiefs, and speaks of it in these terms. " Denonville (Governor of Canada,) dishonera le nom Francois chez les savages par une infame perfidie." (Denonville dishonored the French name by an infamous perfidy.) The Chiefs were sent to the galleys, but we are not told by the author any more about them ; they were probably restored to their country, for soon after we find Denonville constrained to beg a peace of the Iroquois, and using as a mediator the same person, (L'Ambreville, the jesuit missionary to the Iroquois,) whom he had before used as the unconscious instrument, to decoy the unsuspecting chiefs to the pretended conference where they were captured. Had a French officer commanding a post on the African coast, established to carry on the slave trade, decoyed in this manner the chiefs of a tribe of negroes, and after capturing them, sent them as slaves to be sold in the French W. I. Islands, the author would hardly have told us that the French name had been dishonored amongst the negroes by an infamous perfidy, inasmuch as he would in such case have done nothing more, than what the companies incorporated and supported by his country were doing whenever they had the power. But did I want any thing to confirm me in the opinion, that the French Government never tolerated Indian slavery in Louisiana, I would resort to the proclamation of O'Reilly so much relied on by the appellee, and I would suppose, too, with the counsel, " that its tenor had been misconceived by the witnesses through ignorance and length of time." In the copy of the reported case furnished me, I find these words : "Governor O'Reilly, 1769, on taking possession of the colony, discovered that a considerable number of Indians were held in slavery by the French colonists. This he declared by a proclamation to be contrary to the wise and pious laws of Spain, but by

Marguerite *v.* Chouteau.

(85) the same instrument he confirmed the inhabitants in the possession of such In-
dian slaves, until the pleasure of the King in this respect could be known."

" Here," says the report, " is then a recognition of the rights of possessors to
hold their Indian slaves, until the legislative will of the monarch should deprive
them of it." We are given here not an extract, but the import of this proclamation.
In the same reported case we are told, that " it is a principle of the law of nations,
that in cases of the cession of any part of the dominions of one sovereign power to
another, the inhabitants of the part ceded, retain their municipal regulations until they
are abrogated by some act of the new sovereign." This principle of the law of na-
tions, then, is adopted by the laws of all civilized nations, and becomes a part (we may
say) of their municipal law. Even charity would induce us to believe that O'Reilly
knew this, and consequently, also, that he must have been able to draw this conclu-
sion, that if by the laws of France, previous to 1769, a subject of France residing in
the province of Louisiana, had a right to hold Indians in slavery, he had also, after
the year 1769, under the Government of Spain, a right to hold his Indian slave under
this principle of the law of nations; and that this being no violation of the wise
and pious laws of Spain, the inhabitants stood in no need of O'Reilly's permission
to hold their Indian slaves. I conclude, then, that O'Reilly well knew that by the
laws of France, Indians were not allowed to be reduced to slavery in Louisiana;
thence, under the Spanish rule, the subject holding an Indian slave was said to do an
act contrary to the laws of Spain. This proclamation, we are told, is a law; I do
not understand that O'Reilly had power to make laws, and he certainly does not here
pretend to make one, he only pretends to suspend the effects of a law, and this is
called a recognition of the right of the possessors to hold their Indian slaves, until
the legislative will of the monarch should deprive them of it; this (it is said) never
did happen: I say it had already happened. The law is the will and only known
will of the King of Spain; at all events, the Courts of this State now succeed to
those of Spain, and if O'Reilly had the power, (which I by no means concede,) to
suspend the effects of a law, that law is now revived. If the party had rights under
the French Government, those rights continue under each change of government,
and he can now prosecute them as he could have done under the French Govern-
ment. " In conformity with O'Reilly's opinion," we are told, " is a decree of the
Baron de Carondelet, twenty-five years after, by which he ordered two Indians,
(86) Alexis and David, to return to and abide with their owners, until the royal will
was expressed to the contrary." These are not decisions, they are denials of justice
for which there might have been political reasons to excuse before his superior, an of-
ficer vested with the supreme executive and judicial power of the province. To give
this decision, or rather this order of Carondelet, the character of a judgment, he ought
to have said whether the Indians were slaves or not; then they would have been enti-
tled to their appeal to the supreme judicial power; it might further be added that even
the Natchez, so jealous of their liberty, never once complained that the French made
personal slaves of them. Political slavery was all they dreaded. When the Sun of the
White Apple assembled his council, to deliberate on the means of delivering them-
selves from Chepart's tyranny, one of the ancient chiefs, in a speech of some length,
enumerated the evils they had suffered from the French; among which were the cor-
ruption of manners, and the encroachment of the French upon their political rights,
and then indignantly observes, " that the French, when they get sufficient strength,
will soon begin to treat them as they do their black slaves:" he also complained of

the fondness of the young people for the French merchandize, and concludes by advising that the neighboring tribes should be invited to a league; that these tribes should be informed that the French being the stronger in the neighborhood of the Natchez, would first oppress them, and as they acquired strength, would extend their acts of oppression to the other tribes.

Du Pratz is very perticular in enumerating the prisoners restored by the Natchez to Loubois, at the capitulation before mentioned. M. de Loubois, (he says,) assured the agent of the Natchez, that he promised them peace as he demanded it in the name of the whole nation; but he granted it to them only on the condition, that they should restore not only the French women and children, but also the French men who were in the fort, and all the negro men and negro women, the negro boys and negro girls, which they had taken from the French. (*M. de Loubois l'asura qu'il leur promittaiet la paix comme il la demandait au nom de toute la nation; mais qu'il ne la leur accordait quaux conditions qu'ils rendraient non seulement les femmes et les enfans Francais, ma's aussi le Francais qui etaient au fort, et tous le negres, negresses, negrillons, et negrittes qu'ils avaient pris aux Francais.*) Not one Indian slave is de-(87) manded. Had there been any, Loubois had the will and the power to enforce restoration.

I have shown that the different European powers actively engaged in the African slave trade; that for the purpose they established military posts and incorporated companies; that England enforced the slave trade in Virginia; and I have shown that even in Virginia, where a statute had authorized Indian slavery, the Courts held that Indians were *prima facie* free. The case of Pallas and others *v.* Hill, in 2 *Hen. & Mun.*, shows that after the lapse of more than an hundred years, Indians have in that State sued for and obtained their freedom. In this African slave trade, I have shown that France also engaged. Du Pratz, in the volume before quoted, page 319, says that after the cession of the colony by the company to the King of France, he continued the management of the plantation then, viz: 1730, belonging to the King, and received pay for the negroes sold by the company to the inhabitants. I might pursue the same author through one hundred pages of his volume, and show M. Bourgmont eagerly engaged in making peace between the Padoucas and other tribes in alliance with the French, in order to remove all obstacles to the fur trade with those nations. I might dwell on the flattering language he addresses to them, and the desire which he assures them the King of France has, that they should live in peace and friendship with each other, and with the French. Who are the white men, he says to the Canzas, that demand slaves of you? if there be any, they are the enemies of all men, and their heart is all gall. Live then in peace, my dear friends; and then our sovereign will be your father, as he is the father of us all. (*Qui sont les blancs qui vous demandent des esclaves? si'l y en a qui vous en demandent, ils sont'ennemis de tous les hommes et leur coeur est tout fiel. Vivez donc en paix, mes chevs amis; et alors notre soverain sera votre pere, comme il est le notre a nous tous.*)

I might then at the end of Bourgmont's voyage, introduce the author reflecting on the policy and address necessary to be used in the intercourse with the Indians, and the great profits of the fur trade, the object of Bourgmont's voyage; and ask if it be possible that the French could be so blind to their interests as to attempt to make slaves of a people, represented by the same author, so passionately fond of liberty, and whose friendship they had used so much industry to acquire.

Marguerite v. Chouteau.

But I will now take a view of what Raynal says of the intercourse between the (88) French and Indians. Raynal, one of the authors quoted by the appellee, says, in his account of the establishment of the French in North America, book 15, that in 1627 the French had in Canada only three miserable establishments surrounded with palisades. This languor, he says, had no other cause than the system of an exclusive company, which thought less of establishing a national power in Canada, than of enriching itself by the fur trade. Again, he says, the French had planned their establishments badly. In order to maintain the appearance of reigning over a great extent of country, and to get nearer to the peltry, they had made their settlements at such a distance from each other, that there was almost no communication, and they were not able to help each other. Chap. 10th of the same book, he says, the fur trade was the first object of the commerce of the Europeans in Canada. The French colony first carried on the trade at Tadousac, a port thirty leagues below Quebec. In 1640, the town of Trois Revieres, built twenty-five leagues above the capital, became a second store house. In time Montreal drew to itself all the peltry. In the month of June the bark canoes arrived. The number of savages that brought them did not fail to increase as the French became better known. The recital of the reception they had met with, and the sight of the goods they had received in exchange for their furs, all augmented the crowd. Never did they return to sell their peltry without bringing with them a new nation.

The English, he says, became jealous of this branch of commerce, and had almost ruined it, when the Court of France took the trade of these posts into their own hands and gave the Indians better treatment. The French traders, he says, sold their goods too high; this was all the ill treatment the Indians received from them. The English tralers sold their goods lower, and consequently treated them better. Again he tells us that France had long labored incessantly to raise a chain of Forts which she thought necessary to her safety and to her prosperity in North America. Those she had built on the west and south of the St. Lawrence, to curb the ambition of the English, were large and strong. Those she had placed on the different Lakes, in important situations, formed a chain extending 1000 leagues north of Quebec; but they were nothing but miserable palisades destined to restrain the savages, and to assure herself of their alliance and the produce of their hunts.

Passing from Canada to Louisiana, both countries being under the same Governor, and governed by the same policy, we find Joliet and Marquitle returning home from (89) exploring the Mississippi, and giving an account of the Illinois, a numerous people much disposed to form an alliance with the French; and the Fort Maubile, built to keep in the alliance of the French, the Chactas, Alimabous, and other tribes less numerous, and to secure their peltry. Both in Canada and in Louisiana, the fur trade is the object of every establishment.

I have found in none of the historians any notice of an Indian slave population, either in Louisiana or in Canada. Stoddard, in the 12th chapter of his sketches of Louisiana, dwells altogether on African slavery, but says not one word of Indian slavery, nor does Breckenridge. Raynal, in 13th chap. of the 16th book of his History of the two Indies, so much referred to, says that his calculation (of the population of Canada) does not include the numerous allies scattered over a space of 1200 leagues in length by a sufficient width, nor even 46,000 Indians domicilated in the neighborhood of the French settlements. None of them were ever subjects. In the midst of a great European population, the smallest tribes maintained their inde-

pendence. All men talk of liberty, but the savages alone possess it. It is not simply the whole nation, but it is each individual who is truly free. This author speaks of negro slavery in Louisiana, but not of Indian.

I might from the same authors have produced many more instances of the attention of the French to cultivate the friendship of the Indians of North America. I have not mentioned half the posts established for carrying on the fur trade. I might have produced more instances of the rivalry of the English and French in courting the friendship of those nations, and I might have produced instances of the French officers intermarrying with them and adopting their manners.

But we find no companies incorporated to carry on a trade in Indian slaves; no posts established to protect companies or individuals engaged in such a trade, nor even an Indian slave population in Louisiana or Canada once mentioned by the authors quoted, or any others within my knowledge.

Bourgmont, indeed, in the extract which I have made from his speech to the Canzas, seems to think that white men might have instigated the Indians to war for the purpose of buying their prisoners to make slaves of them. I will repeat his words. " Who are the white men that demand slaves of you? if there be any such, they are enemies of all men, and their heart is all gall. Live then in peace, my dear friends, and then (90) our sovereign will be your father as he is ours." From the tenor of the whole speech, I am inclined to think that traders in the Indian slaves were as much discountenanced in those times by the French Government, as traders in African slaves now are by the American Government.

The speech is entitled to some consideration, being addressed to the Canzas by an immediate commissioner of the King of France, then employed on his sovereign's business, and designed as it seems, to meet the King's eye; for the author tells us, page 216, that his account of Bourgmont's voyage was extracted and much abridged from the journal of that commandant; that he copied it from the original signed by all the officers and other persons who accompanied Bourgmont in this voyage. (Ce voyage detaille que je viens d'offrir aux yeux du lecteur, a ete extrait et tres abrege du journal du voyage de M. de Bourgmont au Padoucas. Je l'ai tire sur l'original signe de tous les officiers et personnes en place qui ont fait ce voyage avec ce commandant.)

I have now shown that both the English and French did not merely tolerate the African slave trade as was contended, but actively engaged in it for the supply of their colonies in North America. While, on the contrary, all the posts established by the French in North America, were designed to secure to themselves the commerce and friendship of the Indian tribes, and that an Indian slave population in Louisiana was unknown to the author cited by the appellee.

I conclude, then, that such a population was unknown to the laws and Government of France. That the small number of Indians which might have been purchased by French traders, were either clandestinely sold to other Indian tribes, or retained in the French settlements by the purchasers or their friends, under pretence that they remained voluntarily; and that under the French Government of Louisiana, the holders of such slaves never would have asserted, in a Court of Justice, a claim to property in an Indian. Accordingly we see those pretensions to property in Indians first ripening into claims under the Spanish rule, when the population of the province was disaffected by the Court of Spain, and Governors might be presumed to be disposed to do much to conciliate the rich and powerful at the

Marguerite *v.* Chouteau.

expense of the weak and defenceless.   With all this evidence before our eyes, of the disposition of the French Government to court the friendship of the Indians, we are required to presume an unwritten law of France, permitting her subjects to reduce Indians to slavery:   Unwritten it must be, since we find no book containing an account of it.   But are not all the laws of civilized nations in reality written? and is not the phrase, *unwritten law*, merely a figure of speech?   All men are, by the law of nature, free; and without some positive declaration of the sovereign power of the State to the contrary, all judicial tribunals, in my opinion, set at liberty every individual who sues for his freedom.   On this point, then, I am for the appellant. .

Fifth.  I find nothing to induce me to think, that under the French Government of (91) Louisiana, private persons had a right to reduce Indians of the Natchez tribe to slavery: and the circumstance of an Indian being transferred by sale or gift can make no difference in the case.   A person held in bondage can give no assent.   No person can assent to enslave himself; and as to its being evidence of the assent of the Government under which he lives, I have before said enough.   Had it been in evidence that the ancestor of the plaintiff was one of the 300 Indians sent by Perier into St. Domingo as slaves, I should have thought the plaintiff was lawfully held in slavery.

Sixth.  It was not, I think, contended in argument by the appellant, that the declaration of Tayon, testified to by Reviere, amounted to an act of emancipation.   On this point, I am for the appellee.

Seventh.  On this point the law is clearly for the appellee.   Negroes held in bondage under the French Government, would be considered lawfully slaves, unless they could prove their exemption from the common rule.

The judgment of the Circuit Court ought, in my opinion, to be reversed.


Opinion of WASH, J.

This cause is duly stated in the opinion delivered by my brother Judge, and in the briefs of counsel, and was very ably argued on both sides.   Many questions have arisen in its progress; some of great interest and difficulty, which I shall not attempt to discuss.   The only one I shall notice (it being decisive on the merits) grows out of the four first instructions asked for by the appellee's counsel, and given in the Court below, viz:—Whether an Indian of the Natchez tribe, taken prisoner in the war that exterminated that nation, might lawfully be reduced to slavery?   I consider it as clearly settled by the testimony, that the maternal grand mother of the plaintiff was a Natchez woman taken prisoner by the French in the prosecution of an exterminating war against that tribe about the year 1731—that she was reduced to slavery, and that she and her descendants have been held in slavery ever since.   The authority of Du Pratz is altogether consistent with the mass of evidence given on this head; and if it were not, it could weigh but little in opposition to it.   Du Pratz, III, p. 326, says, that when the French returned to New Orleans with the Natchez slaves, "they put them in prison, but as it was too small to contain so many people long, without exposing them to infection on account of being crowded together, they placed the women and children upon the plantation of the King and elsewhere." (92) "On les mit en prison; mais comme elle' etait trop petite pour continer long tems tout ce peuple, sans s'exposer a entre infecte de leur visionage on mait les femmes et les enfans sur l'habitation du Roi et allieurs."   And that "after a short time,

they embarked these slaves for the Island of St. Domingo, (by which means,) therefore, this nation became extinct in the colony." "Peu apres on embarqua ces esclaves pour l'ile de St. Dominique, afin que cette nation fut eteinte dans la colonie." This authority has been misunderstood, and standing alone, would justify the belief that some of these prisoners who had been "placed upon the plantation of the King and elsewhere," might have remained in the country. Be that as it may, the testimony, as I conceive, establishes the fact clearly, that the maternal grand mother of the plaintiff was so captured and did so remain. The first four instructions asked for by the appellee's counsel, were, therefore, correctly given, if the law be with them upon the main question. It has been conceded by the counsel for the appellant, that the municipal law might give title, but they contend that the law of nations could not: that there can be no proscription against human liberty or the claim to freedom, and that the appellee is bound to show that its title in its *inception* was legal. These positions have been maintained with great ability and research, but principles have been misapplied and the law is against them.

In America, the word nation is not of the same import as in other parts of the globe: here it is applied to small societies or independent tribes or communities, who subsist by hunting over a vast extent of Territory; whose ideas of property are limited to the game they catch or kill: amongst whom there is no distinction but what arises from personal qualities, being without government, authority, subordination or prescribed duties—whose actions flow from the impulse of their own feelings or passions, unchecked, uncontrolled, unpunished. No natural rights are surrendered. The first step towards establishing a public jurisdiction has not been taken by them. The right of revenge is left in private hands: if violence is committed, or blood is shed, the community does not assume the power of inflicting or moderating punishment; it is the right and business of individuals, whose resentment is implacable and everlasting. There is (properly speaking) no such thing as public war amongst savage tribes. They are more or less general, as the individual who may have been injured, may chance to be more or less beloved. All wars are private, for the re-(93) dress of individual or family wrongs; are conducted on the same principles, influenced by the same ideas, animated by the same spirit as in prosecuting private vengeance. Resentment may be sometimes suppressed or smothered, but is never extinguished; and often, when least expected, bursts forth with desolating fury. They fight not to conquer, but to destroy. The first article of their creed in prosecuting vengeance, is "never to look in peace upon the face of a living enemy." And though prisoners are sometimes taken, they are killed or enslaved, at the pleasure of the victor. Can it be contended for a moment, that the laws of nations regulating wars between civilized communities, were intended to apply to, or can operate upon such tribes? It may suffice to answer, that it never has been so held by any writers on those subjects, and that the high authority referred to, does in express terms assert the contrary, (Vat. p. 520,) the only one of the whole code that can be made to reach them, is the law of retaliation, to which civilized nations sometimes resort, and which they may rightfully enforce against all savage prisoners, without regard to age, sex, or condition. The description above, is applicable to the Indian tribes of North America generally, as they existed about the commencement of the 18th century; and to the Natchez nation at the time of their capture by the French. I deem it unnecessary to say any thing as to the authority by which the war was declared or conducted. Upon this point, then, I deem the evidence given in the Court below, en-

Marguerite v. Chouteau.

tirely competent, and the Circuit Court did right in giving the four first instructions asked for by the appellee's counsel.

I choose to avoid the discussion of the other main question involving the legality of Indian slavery in general, but deem it proper to state, that from every examination I have been able to make of the matter, in reason and in law, (if it is not a perversion of terms so to speak,) upon principle and authority, it should be placed upon the same footing with negro slavery. I incline to think, too, that much confusion and misapplication of principles has arisen from the double light in which slaves are re-regarded; partly as mere property, and partly as persons capable of asserting full rights.

There being a division of the Court, by operation of law, the judgment of the Circuit Court is affirmed.

(a.)   See same case, 3 Mo. R., p. 540, in which this decision was overruled, and the case decided in conformity with the opinion of Judge Tompkins.