GROVES V. BLANKENSHIP 






NO. 10-91-062-CV

IN THE
COURT OF APPEALS
FOR THE
TENTH DISTRICT OF TEXAS
AT WACO

* * * * * * * * * * * * *

Â Â Â Â Â Â Â Â Â Â CECIL GROVES,
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Appellant
Â Â Â Â Â Â Â Â Â Â v.

Â Â Â Â Â Â Â Â Â Â THOMAS J. BLANKENSHIP,
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Appellee

* * * * * * * * * * * * *

 From the 19th Judicial District Court
McLennan County, Texas
Trial Court # 90-2559-1

* * * * * * * * * * * * *

O P I N I O N

* * * * * * *
Â Â Â Â Â This appeal was perfected from a judgment signed on April l, 1991.
Â Â Â Â Â By motion Appellant requests that this appeal be dismissed. Appellee has not opposed the
dismissal. The motion is granted. The appeal is dismissed.
Â Â Â Â Â By motion Appellee requests the Court to assess damages pursuant to Rule 84, Tex. R. App.
P., alleging that the appeal was instituted for the purpose of delay and without sufficient cause.
Â Â Â Â Â No statement of facts has been filed and without same we are unable to determine these issues. 
See Mid-Continent Cas. Co. v. Whatley, 742 S.W.2d 475, 479 (Tex.App.âDallas 1987, no writ).
Â Â Â Â Â Â Â Â Â Â The motion for Rule 84 damages is denied.
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â PER CURIAM

Before Chief Justice Thomas,
Â Â Â Â Â Â Â Â Â Â Justice Cummings and
Â Â Â Â Â Â Â Â Â Â Justice Vance
Dismissed
Opinion delivered and filed September 18, 1991
Do not publish



of trial counsels failure to raise a speedy trial claim and
counselÂs failure to request a mistake-of-fact instruction in the charge (two points);
(3) he received ineffective assistance of counsel because of these failures
(two points); and (4) he was denied due process and due course of law because
of the StateÂs failure to disclose Brady evidence before trial.

I. Background

Â Â Â Â Â Â Â Â Â  Department of Public Safety Trooper
Mike Asby stopped Pena for a traffic violation.Â  As Asby approached PenaÂs van,
he smelled the odor of raw marihuana.Â  Asby looked inside PenaÂs van and saw what
he believed to be freshly cut marihuana covering the entire cargo area.Â  According
to Asby, Pena repeatedly denied that the plant material was marihuana.Â  He
could not recall whether Pena had informed him that he wanted the plants independently
tested.[1]Â  DPS
criminalist Charles Mott tested the plant material and reported that it consisted
of 23.46 pounds of marihuana.

Â Â Â Â Â Â Â Â Â  Pena filed a motion for independent analysis
of the plant material, which the trial court granted.Â  Thereafter, it was
discovered that the plant material and all records relating to the material had
been destroyed. Â All that remained was a lab report stating that the plant
material was marihuana, signed by Mott, and sent from the lab to Asby.

Â Â Â Â Â Â Â Â Â  In a hearing outside the presence of
the jury, Mott testified that he personally tested the material and found that
it was 23.46 pounds of marihuana.Â  Yet, he was unable to recall the materialÂs
weight from memory, how the material was contained, or how he took samples for
testing.Â  He also could not recall when it was tested.

Â Â Â Â Â Â Â Â Â  Based upon a computer entry, Mott
testified that he received a notice to dispose of the evidence and that it was
destroyed one month later.Â  However, Mott conceded that he did not know who
sent the notice and stated that not only was the plant material destroyed, but
the entire file containing the notice to destroy, the original worksheet,
reports, letters, and submission forms was lost.Â  He admitted that this had
never occurred before or since, but he attributed the cause of the missing file
to his labÂs recent move to a new building.

Â Â Â Â Â Â Â Â Â  The trial court took judicial notice
of the fact that there was no destruction order from the trial court in the
clerkÂs file.Â  The district attorney testified that he did not sign an order
for the destruction of the evidence.Â  Asby, the only other person whom Mott
believed could have requested the destruction, testified that he did not
remember signing such an order.

Â Â Â Â Â Â Â Â Â  Pena argued to the trial court that
the report, and all testimony concerning the report, should be suppressed
because the destruction of the marihuana violated his right to due process under
the United States and his right to due course of law under the Texas
Constitution.Â  The trial court overruled PenaÂs objection.Â  Pena also requested
a limiting instruction, which the court denied.

II. Fourteenth Amendment

Â Â Â Â Â Â Â Â Â  Pena contends in his first issue that
the admission of MottÂs lab report and testimony violated his right to due
process under the Fourteenth Amendment to the United States Constitution.

Â Â Â Â Â Â Â Â Â  Because no independent analysis was
ever done, it is undisputed that the destroyed plant material was only
potentially exculpatory.Â  When the State loses or destroys evidence which is
only Âpotentially useful,Â the defendant must show that the State acted in bad
faith to establish a due process violation under the Fourteenth Amendment.Â  Arizona v. Youngblood, 488 U.S. 51, 58, 109 S. Ct. 333, 337, 102 L. Ed. 2d
281 (1988); McGee v. State, 210 S.W.3d 702, 704 (Tex. App.ÂEastland 2006,
no pet.).

Â Â Â Â Â Â Â Â Â  There is no evidence that DPS
officials acted in bad faith when they destroyed the plant material or when
they lost the accompanying records.Â  Thus, Pena cannot prevail on his due
process claim under the Fourteenth Amendment.

III. Article I, Section 19

Â Â Â Â Â Â Â Â Â  Nevertheless, Pena also contends in
his first issue that the Due Course of Law provision in article I, section 19 of
the Texas Constitution provides a greater level of protection than the Due
Process Clause of the Fourteenth Amendment.[2]

Â Â Â Â Â Â Â Â Â  The State argues that Pena has not
preserved this aspect of his first issue for appellate review because he did
not argue in the trial court that the Texas Constitution provides greater
rights than the federal constitution.Â  We disagree.Â  Pena argued to the court
that his rights under the Due Course of Law provision of the Texas Constitution
were violated by the admission of this evidence.Â  If, as the State contends,
the federal and state provisions are synonymous, then PenaÂs objection under
the Texas Constitution was meaningless.

Â Â Â Â Â Â Â Â Â  Pena specifically objected to the
trial court that the admission of MottÂs testimony andÂ  the lab report would
violate his right to due course of law under article I, section 19 of the Texas
Constitution because the State had destroyed the seized plant material.Â  This
was sufficient to preserve this issue for appellate review.Â  See Sax v.
Votteler, 648 S.W.2d 661, 664 (Tex. 1983) (rejecting court of appealÂs
holding that Âopen courtsÂ complaint was not preserved by plaintiffÂs objection
that statute violated the Âdue process provisions of the United States and
Texas ConstitutionsÂ); cf. Heidelberg v. State, 144 S.W.3d 535, 542-43
(Tex. Crim. App. 2004) (holding state constitutional issue not preserved
because of, among other things, ÂcounselÂs failure to cite to the state
constitutionÂ).

Â Â Â Â Â Â Â Â Â  Provisions of the Texas Constitution
which have analogues in the federal constitution are generally interpreted to
have the same meaning.Â  The Texas Constitution should be interpreted as
providing broader protection than its federal counterpart only if such an
interpretation has Âfirm support in state history or policy.ÂÂ  Cobb v. State,
85 S.W.3d 258, 267-68 (Tex. Crim. App. 2002); accord Ex parte Lewis, No.
PD-0577-05, 2007 WL 57823 passim (Tex. Crim. App. Jan. 10, 2007).Â  Thus,
the Texas Constitution should be interpreted as providing rights not found in
the federal constitution Âonly when unique aspects of Texas history,
jurisprudence, or law support that separate interpretation.ÂÂ  Cobb, 85
S.W.3d at 268. And it is not appropriate to construe the Texas Constitution
differently merely because this Court believes that federal precedent is
incorrect.Â  See Cobb, 85 S.W.3d at 267.

Â Â Â Â Â Â Â Â Â  In Lewis, the Court of Criminal
Appeals overturned its prior holding in Bauder v. State that the Double
Jeopardy provision (article I, section 14) of the Texas Constitution provides
more expansive protection in a case involving a prosecutor-induced mistrial
than the Double Jeopardy Clause of the federal constitution.Â  Lewis,
2007 WL 57823, at *1 (overruling Bauder, 921 S.W.2d 696 (Tex. Crim. App.
1996)).Â  The Court in so doing considered: (1) the historical context in which
article I, section 14 of the Texas Constitution was framed, including: English
common law, nineteenth century decisions in other states, prior versions of the
Texas Constitution, and nineteenth century decisions in Texas cases; (2) more
recent decisions in Texas and other jurisdictions; and (3) practical
considerations.Â  Id. 2007 WL 57823, at *14-26.

A. Historical Context

Â Â Â Â Â Â Â Â Â  In its present form (since 1876), the
Due Course of Law provision of the Texas Constitution states:

No citizen of this State shall be deprived of
life, liberty, property, privileges or immunities, or in any manner
disfranchised, except by the due course of the law of the land.

Â 

Tex. Const. art. I, Â§ 19.Â  This provision traces its Texas lineage to section 7 of the Declaration of Rights in the 1836 Constitution of the Republic of Texas.Â  See Repub. Tex. Const.
of 1836, Declaration of Rights, Â§
7, reprinted in 1 H.P.N. Gammel,
The Laws of Texas 1822-1897, at 1069, 1083 (Austin, Gammel Book Co. 1898).

Â Â Â Â Â Â Â Â Â  The genesis for the due course of law
provisions in the current and former Texas Constitutions is the Magna Carta. Â Sax,
648 S.W.2d at 664; Tex. Const. art.
I, Â§ 19 interpretive commentary.Â  Chapter 29 of the Magna Carta of 1225
provided:

No Freeman shall be taken, or imprisoned, or be
disseised of his Freehold, or Liberties, or free Customs, or be outlawed, or
exiled, or any other wise destroyed; nor will We not pass upon him, nor condemn
him, but by lawful judgment of his Peers, or by the Law of the Land. Â We will
sell to no man, we will not deny or defer to any man either Justice or Right.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  

Edward Coke, 2
Institutes, *45.

Â Â Â Â Â Â Â Â Â  Thus, according to the Magna Carta, a
ÂFreemanÂ could not be Âtaken,Â Âimprisoned,Â or ÂcondemnedÂ except by the Âlawful
judgment of his Peers, or by the Law of the Land.ÂÂ  As Lord Coke explained, the
term Âthe Law of the Land (that is, to speak it once for all) [means] by the
due course, and processe of Law.ÂÂ  Id. at *46.Â  He further observed:

For the true sense and exposition of these
words, see the Statute of 37. Edw. 3. cap. 8. where the words, by the law of
the Land, are rendred, without due process of Law, for there it is said, though
it be contained in the great Charter, that no man be taken, imprisoned, or put
out of his free-hold without proces of the Law; that is, by indictment of
presentment of good and lawfull men, where such deeds be done in due manner, or
by writ originall of the Common law.

Â 

Id.
at *50.

Â Â Â Â Â Â Â Â Â  The close relationship between these
terms was early recognized by the Supreme Court of the United States.

The words, Âdue process of law,Â were
undoubtedly intended to convey the same meaning as the words, Âby the law of
the land,Â in Magna Charta.Â  Lord Coke, in his commentary on those
words, (2 Inst. 50,) says they mean due process of law.Â  The constitutions
which had been adopted by the several States before the formation of the
federal constitution, following the language of the great charter more closely,
generally contained the words, Âbut by the judgment of his peers, or the law of
the land.ÂÂ  The ordinance of congress of July 13, 1787, for the government of
the territory of the United States northwest of the river Ohio, used the same
words.

Â 

Den v. Hoboken Land & Improvement Co., 59 U.S. (18 How.) 272, 276, 15 L. Ed. 372
(1855).

Â Â Â Â Â Â Â Â Â  When Texas became an independent
republic in 1836, there were twenty-four states.Â  The constitutions of nineteen
of them provided a due process protection similar to that found in the Magna
Carta and may be placed in four general categories:[3]

Â·Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
those providing that a
person could not be deprived of life, liberty, property, etc. unless by the
judgment of his peers or the law of the land;[4]

Â 

Â·Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
those providing for the
rights of an accused person and stating particularly that an accused may not be
deprived of life, liberty, property, etc. unless by the judgment of his peers
or the law of the land;[5]

Â 

Â·Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
those providing that all
courts should be open and/or that all persons should have for injuries done
them a remedy by due course of law;[6]
and

Â 

Â·Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
those providing for the
rights of an accused person and stating particularly that an accused may not be
deprived of life, liberty, property, etc. unless by due course of law.[7]

Â 

During the eighteenth and nineteenth centuries,
the courts in these states uniformly followed Lord CokeÂs interpretation that
the terms Âthe law of the land,Â Âdue process,Â and Âdue course of lawÂ are
synonymous.[8]

Â Â Â Â Â Â Â Â Â  The Texians who served on the
committee appointed to draft a constitution for the Republic[9]
had for their consideration the federal constitution Âand that of several
southern states.ÂÂ  John Cornyn, The Roots of the Texas Constitution:
Settlement to Statehood, 26 Tex. Tech.
L. Rev. 1089, 1122 (1995).Â  The committee proposed the following
provision in the Declaration of Rights which would ultimately become the Texas due course of law guaranty:

Â Â Â Â Â Â Â Â Â  No citizen shall be taken, or
imprisoned, or dispossessed of his freehold, liberties, or privileges, or
outlawed, or exiled, or in any manner disfranchised, or deprived of his life,
liberty or property, but by the law of the land.

Â 

Draft Repub. Tex.
Const. of 1836, Declaration of Rights, Â§ 8 (Mar. 9,
1836), reprinted in 1 Gammel,
at 859, 869.Â  The Convention considered the proposal and made some revisions
before adopting the following as section 7 of the Declaration of Rights:

No citizen shall be deprived of privileges,
outlawed, exiled, or in any manner disfranchised, except by due course of the
law of the land.

Â 

Repub. Tex. Const. of 1836,
Declaration of Rights, Â§ 7.

Â Â Â Â Â Â Â Â Â  The Republic of Texas was granted
statehood in 1845.Â  As part of the annexation process, a new constitution had
to be drafted.

As the delegates met, they
had before them the constitutions of most other states, of the United States, and
of the Republic of Texas. Â During the Convention, examples from other
constitutions were addressed as either worthy of emulation or as examples of
what should be avoided. Â The recently completed but unratified Constitution of
Louisiana was held up as a model so often that the President of the Convention,
forty-one year old Thomas Jefferson Rusk of Nacogdoches, exclaimed:

Â 

I sincerely wish that the future Constitution of
Louisiana had remained locked up until our labors were over. Â We have received
no benefits from it, and have come very near to incorporating some articles
which would have been ruinous to Texas. Â We can reflect for ourselves, and are
capable of forming a Constitution for ourselves.

Â 

Another disapproving
delegate similarly claimed that he Âdiscovered a disposition to make everything
conformable as far as possible to the system of the Federal government.Â Â Nevertheless, the delegates would refer by name to the
constitutions of twenty states, as well as that of the United States, during their debates. Â In order of frequency of citation, the delegates consulted the state
constitutions of Alabama, Louisiana, Kentucky, Tennessee, Virginia, Pennsylvania, Mississippi, Arkansas, Illinois, Indiana, Ohio, Missouri, New York, North Carolina, Connecticut, Delaware, Georgia, Maine, Michigan, and South Carolina. Â Although
state constitutions in the South were mentioned with relatively greater
frequencyÂwhich is not surprising in light of where the delegates themselves
hailed from and their common economic interest in the preservation of slaveryÂthere
was remarkable openness to examples set by states from all parts of the nation.
Â Indeed, the constitutions of Pennsylvania and Mississippi were cited by the
delegates with identical frequency, as were the constitutions of Arkansas, Illinois, Indiana, and Ohio. Â The Charleston Courier reported: ÂWe need
not say that the instrument is modelled upon the theory of most of our own
state constitutions.Â Â The New Orleans Picayune
concurred Âthat in its grand outline, as well as its details, it is too much
like the constitutions of the old states to need elucidation.Â Â No
single constitution, however, proved to be a template for the Texas document.

Â 

Cornyn, supra, 26 Tex. Tech. L. Rev. at 1091-92 (footnotes omitted).[10]

Â Â Â Â Â Â Â Â Â  Three states joined the Union while Texas was an independent republic.Â  The constitutions of two of them provided a due process
protection similar to that found in the Magna Carta and the states previously
cited.[11]Â  See
Ark. Const. of 1836, art. II, Â§
10; Fla. Const. of 1838, art. I,
Â§Â§ 8, 9.Â  And like the states before them, Arkansas and Florida courts in the
nineteenth century considered the terms Âthe law of the land,Â Âdue process,Â
and Âdue course of lawÂ to be synonymous.Â  See Rison v. Farr, 24 Ark. 161, 1865 WL 377, at *10 (1865); Wooten v. State, 24 Fla. 335, 5 So. 39, 43 (1888).Â 
In addition, Rhode Island adopted a new constitution while Texas was an
independent republic which provided a similar due process protection.Â  See
R.I. Const. of 1842, art. I, Â§ 10.Â 
And the Supreme Court of Rhode Island construed its constitution in the same
manner as these other states.Â  See State v. Keeran, 5 R.I. 497, 505-06,
1858 R.I. LEXIS 72, at *15-17 (1858).

Â Â Â Â Â Â Â Â Â  With this background, Texas adopted article I, section 16 in the Bill of Rights of the 1845 Constitution, which
provided:

Â Â Â Â Â Â Â Â Â  No citizen of this State shall be
deprived of life, liberty, property, or privileges, outlawed, exiled, or in any
manner disfranchised, except by due course of the law of the land.

Â 

Tex. Const. of 1845, art. I, Â§ 16.Â  The 1861 and 1866 Constitutions
had identical provisions.Â  See Tex.
Const. of 1866, art. I, Â§ 16; Tex.
Const. of 1861, art. I, Â§ 16.

Â Â Â Â Â Â Â Â Â  At least one commentator has suggested
that, (1) because of the inclusion of the phrase Âor in any manner
disfranchised,Â and (2) because the delegates to the 1836 Convention added the
phrase Âdue course ofÂ before Âthe law of the land,Â Âthe drafters of the Texas
Constitutions intended to go beyond the protection afforded by the federal
ConstitutionÂ (and by implication, the constitutions of the other states).Â 
James C. Harrington, The Texas Bill of Rights and Civil Liberties, 17 Tex. Tech. L. Rev. 1487, 1526 (1986).Â 
However, early Texas decisions suggest otherwise.

[I]t must be held that the people intended, by [the
Due Course of Law provision], in so far as it is identical with the fourteenth
amendment, to place thereby just such restrictions on the powers of the
legislature as the highest court in the nation has declared is the true
construction of like language made a part of the constitution of the United
States for the purpose of placing a limitation on the power of the legislatures
of the several states.

Â 

Mellinger v. City of Houston, 68 Tex. 37, 3 S.W. 249, 253 (1887).[12]

Â Â Â Â Â Â Â Â Â  ÂDue process of law,Â as used in the
fourteenth amendment, and Âdue course of the law of the land,Â as used in
article 1, Â§ 19, of the Constitution of Texas, and in the Constitutions of many
of her sister states, according to the great weight of authority, are, in
nearly if not all respects, practically synonymous.

Â 

Mabee v. McDonald, 107 Tex. 139, 175 S.W. 676, 679 (1915), revÂd
on other grounds, 234 U.S. 90, 37 S. Ct. 343, 61 L. Ed. 608 (1917); accord
Barnett v. State, 42 Tex. Crim. 302, 62 S.W. 765, 770 (1900).

Â Â Â Â Â Â Â Â Â  Accordingly, when we view the Due Course
of Law provision in article I, section 19 against this historical backdrop, we
must conclude that the framers of the Texas Constitution intended that it be
construed as Âpractically synonymousÂ with the Due Process Clause of the
Fourteenth Amendment[13]
and with comparable provisions in the constitutions of other states.Â  See Tex. WorkersÂ Comp. CommÂn v. Patient Advocates of Tex., 136 S.W.3d 643, 658 (Tex. 2004).Â  However, this does not end our inquiry.

B. Evolution of Due Process Jurisprudence

Â Â Â Â Â Â Â Â Â  The United States Supreme Court has
long recognized that due process is not a static concept.

We have held that the Due Process Clause of the
Fourteenth Amendment incorporates most of the Bill of Rights against the States.Â 
It is tempting, as a means of curbing the discretion of federal judges, to
suppose that liberty encompasses no more than those rights already guaranteed
to the individual against federal interference by the express provisions of the
first eight Amendments to the Constitution.Â  But of course this Court has never
accepted that view.

Â 

Â Â Â Â Â Â Â Â Â  It is also tempting, for the same
reason, to suppose that the Due Process Clause protects only those practices,
defined at the most specific level, that were protected against government
interference by other rules of law when the Fourteenth Amendment was ratified.Â 
But such a view would be inconsistent with our law.Â  It is a promise of the
Constitution that there is a realm of personal liberty which the government may
not enter.Â  We have vindicated this principle before.Â  Marriage is mentioned
nowhere in the Bill of Rights and interracial marriage was illegal in most
States in the 19th century, but the Court was no doubt correct in finding it to
be an aspect of liberty protected against state interference by the substantive
component of the Due Process Clause in Loving v. Virginia, 388 U.S. 1,
12, 87 S.Ct. 1817, 1824, 18 L.Ed.2d 1010 (1967)Â  .Â  .Â  .Â  .

Â 

Â Â Â Â Â Â Â Â Â  Neither the Bill of Rights nor the
specific practices of States at the time of the adoption of the Fourteenth
Amendment marks the outer limits of the substantive sphere of liberty which the
Fourteenth Amendment protects.Â  As the second Justice Harlan recognized:

Â 

Â[T]he full scope of the liberty guaranteed by
the Due Process Clause cannot be found in or limited by the precise terms of
the specific guarantees elsewhere provided in the Constitution.Â  This ÂlibertyÂ
is not a series of isolated points pricked out in terms of the taking of
property; the freedom of speech, press, and religion; the right to keep and
bear arms; the freedom from unreasonable searches and seizures; and so on.Â  It
is a rational continuum which, broadly speaking, includes a freedom from all
substantial arbitrary impositions and purposeless restraints, . . . and which
also recognizes, what a reasonable and sensitive judgment must, that certain
interests require particularly careful scrutiny of the state needs asserted to
justify their abridgment.Â

Â 

Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 847-48, 112 S. Ct. 2791, 2804-05,
120 L. Ed. 2d 674 (1992) (quoting Poe v. Ullman, 367 U.S. 497, 543, 81 S. Ct. 1752, 1776-77, 6 L. Ed. 2d 989 (1961) (Harlan, J., dissenting)) (other
citations omitted).

Â Â Â Â Â Â Â Â Â  In another case, the Court observed
that procedural due process Âformulates a concept less rigid and more fluid
than those envisaged in other specific and particular provisions of the Bill of
Rights.ÂÂ  County of Sacramento v. Lewis, 523 U.S. 833, 850, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998) (quoting Betts v. Brady, 316 U.S. 455, 462, 62 S. Ct. 1252, 1256, 86 L. Ed. 1595 (1942)); see also Guardian Royal Exch.
Assurance, Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 230 (Tex.
1991) (Âthe parameters of personal jurisdiction have evolved as the United
States Supreme Court has continued to examine, develop and refine the permissible
reach of federal due processÂ).

Â Â Â Â Â Â Â Â Â  Thus, the United States Supreme Court
considers historical practice, contemporary jurisprudence, and Âfundamental
fairnessÂ in evaluating an issue involving a defendantÂs right to procedural
due process.Â  See Cooper v. Oklahoma, 517 U.S. 348, 356-67, 116 S. Ct. 1373, 1377-83, 134 L. Ed. 2d 498 (1996).Â  The Court has emphasized that historical
practice is a Âprimary guideÂ in this inquiry.Â  Montana v. Egelhoff,
518 U.S. 37, 43-44, 116 S. Ct. 2013, 2017-18, 135 L. Ed. 2d 361 (1996) (citing Medina v. California, 505 U.S. 437, 446, 112 S. Ct. 2572, 2577-78, 120 L.
Ed. 2d 353 (1992)).Â  Nevertheless, as Justice OÂConnor observed in her
concurring opinion in Medina, historical considerations are not the sole
basis for determining this type of claim:

While I agree with the Court that
historical pedigree can give a procedural practice a presumption of
constitutionality, the presumption must surely be rebuttable.

The concept of due process is,
Âperhaps, the least frozen concept of our lawÂthe least confined to history and
the most absorptive of powerful social standards of a progressive society. Â But
neither the unfolding content of Âdue processÂ nor the particularized
safeguards of the Bill of Rights disregard procedural ways that reflect a
national historic policy.Â Â Against the historical status quo, I read the CourtÂs
opinion to allow some weight to be given countervailing considerations of
fairness in operation, considerations much like those we evaluated in Mathews.
Â Any less charitable reading of the CourtÂs opinion would put it at odds with
many of our criminal due process cases, in which we have required States to
institute procedures that were neither required at common law nor explicitly
commanded by the text of the Constitution. Â See, e.g., Griffin v.
Illinois, supra, (due process right to trial transcript on
appeal); Brady v.
Maryland, 373 U.S.
83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) (due process right to
discovery of exculpatory evidence); Sheppard v.
Maxwell, 384 U.S.
333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966) (due process right to
protection from prejudicial publicity and courtroom disruptions); Chambers v.
Mississippi, 410 U.S.
284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973) (due process right to
introduce certain evidence); Gagnon v.
Scarpelli, 411 U.S.
778, 93 S. Ct. 1756, 36 L. Ed. 2d 656 (1973) (due process right to
hearing and counsel before probation revoked); Ake v.
Oklahoma, supra (due process right to psychiatric examination
when sanity is significantly in question).

Â 

Medina, 505 U.S. at 454, 112 S. Ct. at 2582 (OÂConnor, J., concurring) (some citations omitted).

Â Â Â Â Â Â Â Â Â  The Supreme Court of Texas
has likewise observed that constitutional interpretation cannot rest solely on historical
practice.Â  In In the Interest of J.W.T., the Court considered whether under
the Due Course of Law provision of the Texas Constitution a biological father
who is not married to the mother of his child may be denied the opportunity to
establish paternity and claim parental rights in court.Â  872 S.W.2d 189, 189 (Tex. 1994).Â  In analyzing this claim, the Court acknowledged that acceptance of such a
contention Âwould have been highly improbable at the time of the ratification
of our Texas Constitution in 1876.ÂÂ  Id. at 191.Â  But the Court also
observed that Â[s]ignificant twentieth century changes in the resolution of
issues affecting the family are reflected in statutes, demographics, alteration
of social attitudes toward illegitimate children, and decisions of the Texas courts.ÂÂ  Id. at 193.

Â Â Â Â Â Â Â Â Â  In Edgewood
Independent School District v. Kirby, the Court observed:

The Texas Constitution derives its
force from the people of Texas.Â  This is the fundamental law under which the
people of this state have consented to be governed.Â  In construing the language
of [the Texas Constitution], we consider Âthe intent of the people who adopted
it.ÂÂ  In determining that intent, Âthe history of the times out of which it
grew and to which it may be rationally supposed to have direct relationship,
the evils intended to be remedied and the good to be accomplished, are proper
subjects of inquiry.ÂÂ  However, because of the difficulties inherent in
determining the intent of voters over a century ago, we rely heavily on the
literal text.Â  We seek its meaning with the understanding that the Constitution
was ratified to function as an organic document to govern society and
institutions as they evolve through time.

Â 

777 S.W.2d 391, 394 (Tex. 1989) (emphasis added) (citations omitted); see also Weiner v. Wasson, 900
S.W.2d 316, 322 (Tex. 1995) (Owen, J., dissenting) (ÂOver the years our Court
gradually has expanded the reach of [the open courts] provision.Â).

Â Â Â Â Â Â Â Â Â  In a similar vein, our
state supreme court has observed that procedural due process under the Texas
Constitution Âis a flexible concept.ÂÂ  U.S. GovÂt v. Marks, 949
S.W.2d 320, 326 (Tex. 1997); accord Univ. of Tex. Med. Sch. v. Than, 901
S.W.2d 926, 930 (Tex. 1995).Â  Therefore,
in addition to considering the historical context in which article I, section
19 was adopted, we also consider more recent decisions in Texas and other
jurisdictions and other relevant, practical considerations.Â  See Lewis,
2007 WL 57823, at *14-26; J.W.T., 872 S.W.2d at 194-97 & n.19; Edgewood Indep. Sch. Dist., 777 S.W.2d at 398.




C. Recent Decisions

Â Â Â Â Â Â Â Â Â  Texas courts have followed Arizona
v. Youngblood fairly consistently since it was handed down in 1988.Â  See
McGee, 210 S.W.3d at 704; Williams v. State, 946 S.W.2d 886, 893
(Tex. App.Â­Â­ÂWaco 1997, no pet.); Mahaffey v. State, 937 S.W.2d 51, 53 (Tex. App.ÂHouston [1st Dist.] 1996, no pet.); Gamboa v. State, 774 S.W.2d 111,
112-13 (Tex. App.ÂFort Worth 1989, pet. refÂd); but see Ex parte Brandley,
781 S.W.2d 886, 894 (Tex. Crim. App. 1989) (reciting YoungbloodÂs
bad-faith standard but finding due process violation without an express finding
of bad faith[14]).

Â Â Â Â Â Â Â Â Â  And at least seven Texas courts
(including this one) have applied the Youngblood bad-faith requirement
to claims arising under the Texas ConstitutionÂs Due Course of Law provision.Â  See
McGee, 210 S.W.3d at 705; Alvarado v. State, No. 07-06-086-CR, 2006
WL 2860973, at *3 (Tex. App.ÂAmarillo Oct. 9, 2006, no pet.) (not designated
for publication); Salazar v. State, 185 S.W.3d 90, 92-93 (Tex. App.ÂSan Antonio 2005, no pet.); Jackson v. State, 50 S.W.3d 579, 588-89 (Tex.
App.ÂFort Worth 2001, pet. refÂd); Williams, 946 S.W.2d at 893; Mahaffey,
937 S.W.2d at 53; State v. Rudd, 871 S.W.2d 530, 533 (Tex. App.ÂDallas
1994, no pet.).

Â Â Â Â Â Â Â Â Â  However, only four[15]
 Texas courts have specifically addressed a contention that something other
than the Youngblood bad-faith standard should apply to claims arising
under the Texas Due Course of Law provision, and those four courts have agreed
that the Youngblood standard should apply. Â McGee, 210 S.W.3d at
705; Alvarado, 2006 WL 2860973, at *3; Salazar, 185 S.W.3d at
92-93; Rudd, 871 S.W.2d at 533.Â  Courts in twenty-three other states
have likewise concluded that the Youngblood bad-faith requirement applies
to claims arising under their respective constitutions.[16]

Â Â Â Â Â Â Â Â Â  Conversely, courts in twelve states
have considered this issue and have determined that a different standard should
apply.[17]Â  Fourteen
states have not addressed this issue.[18]

Â Â Â Â Â Â Â Â Â  Although a majority of the states
which have addressed the issue have determined that Youngblood should
apply to state constitutional due process claims, a significant minority has
rejected this approach, and a substantial number of states has not even
addressed the issue.Â  Therefore, no clear consensus has emerged.[19]

D. Practical Considerations

Â Â Â Â Â Â Â Â Â  The legal landscape has changed
significantly in the nineteen years since Youngblood was decided,
particularly in the field of evidence preservation.

Â Â Â Â Â Â Â Â Â  The gist of Larry YoungbloodÂs
complaint was that the State of Arizona had failed to preserve seven semen
samples which had been collected from the body and clothing of the 10-year-old
boy whom he had been convicted of sexually assaulting.Â  Youngblood, 488 U.S. at 52, 109 S. Ct. at 334.Â  The Supreme Court rejected YoungbloodÂs contention that the Due
Process Clause required preservation of such Âpotentially exculpatoryÂ evidence
because:

Â·Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
Â[w]henever potentially
exculpatory evidence is permanently lost, courts face the treacherous task of
divining the import of materials whose contents are unknown and, very often,
disputedÂ; and

Â 

Â·Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
the Court was unwilling Âto
read the Âfundamental fairnessÂ requirement of the Due Process Clause as
imposing on the police an undifferentiated and absolute duty to retain and to
preserve all material that might be of conceivable evidentiary significance in
a particular prosecution.Â

Â 

Id.
at 57-58, 109 S. Ct. at 337 (quoting California v. Trombetta, 467 U.S. 479, 486, 104 S. Ct. 2528, 2533, 81 L. Ed. 2d 413 (1984)) (other citation omitted).

Â Â Â Â Â Â Â Â Â  Since 1989, however, the ÂimportÂ of
evidence containing biological material like that which was not preserved in
YoungbloodÂs case has been magnified substantially.Â  Between 1989 and 2003, at
least 144 men and women were exonerated by DNA evidence after having been
convicted of murder or rape.Â  Samuel R. Gross et al., Exonerations in the
United States 1989 through 2003, 95 J.
Crim. L. & Criminology 523, 523-24, 529 (2005).Â  The Innocence
Project states that Â[t]here have been 200 post-conviction DNA exonerations in
the United States.ÂÂ  The Innocence
Project, Facts on Post-Conviction DNA Exonerations (2007), available
at http://www.innocenceproject.org/Content/351.php.Â  Ironically, Larry
Youngblood is one of those who has been exonerated.Â  Barbara Whitaker, DNA Frees
Inmate Years After Justices Rejected Plea, N.Y. Times, Aug. 11, 2000.

Â Â Â Â Â Â Â Â Â  Focusing more closely on Texas, twenty-six men have been exonerated by post-conviction DNA testing in this state as
of February 2007.Â  Jeff Carlton, Dallas County DA Agrees to Let Group
Review Cases for DNA Testing, Dallas Morning News, Feb. 17, 2007.Â  The
governor pardoned another even more recently.Â  Jennifer Emily, Dallas
Man Pardoned in Wrongful Rape Conviction, Dallas Morning News, Mar. 10, 2007.

Â Â Â Â Â Â Â Â Â  In response to the unique problem of
wrongful convictions in Dallas County,[20]
the Dallas County District Attorney Âhas agreed to allow the Innocence Project
of Texas to review whether DNA tests should be done in any of the cases of 354
people convicted of rapes, murders and other felonies as far back as 1970.ÂÂ  Steve
McGonigle, Innocence Project to Review Dallas County Convictions, Dallas
Morning News, Feb. 16, 2007.Â  In a similar situation arising from
problems with the crime lab operated by the Houston Police Department, 370
cases with DNA evidence were referred to private labs for retesting.[21]Â 
Roma Khanna & Steve McVicker, ÂTraceÂ Drug Cases on Hold, Houston
Chron., July 3, 2003, at A1.Â  Problems with the HPD crime lab Âprompted
the review of 1,300 cases it investigatedÂ and led to the pardon of at least
one man who was wrongfully convicted.Â  Roma Khanna, DA Supports Move to
Pardon Sutton, Houston Chron.,
June 28, 2003, at A1; see also Roma Khanna, Perry Signs Pardon for
Sutton, Houston Chron., May 15, 2004, at A1.

Â Â Â Â Â Â Â Â Â  The Texas Legislature has enacted
several statutes since Youngblood which further serve to highlight the
importance of preserving evidence.Â  Most notably, the Legislature enacted
Chapter 64 of the Code of Criminal Procedure in 2001 to provide convicted
persons a procedural vehicle for post-conviction DNA testing.Â  See Act
of Apr. 3, 2001, 77th Leg., R.S., ch. 2, Â§ 2, 2001 Tex. Gen. Laws 2, 2-4 (codified
at Tex. Code Crim. Proc. Ann. ch.
64).Â  In tandem with this legislation, the Legislature also enacted a statute
requiring the State to preserve evidence containing biological material:

(1) until the inmate is executed, dies, or is
released on parole, if the defendant was convicted of a capital felony; or

Â 

(2) until the defendant dies, completes the
defendant's sentence, or is released on parole or mandatory supervision, if the
defendant is sentenced to a term of confinement or imprisonment.

Â 

Act of Apr. 3, 2001, 77th Leg., R.S., ch. 2, Â§ 1,
2001 Tex. Gen. Laws 2, 2 (codified at Tex.
Code Crim. Proc. Ann. art. 38.43).

Â Â Â Â Â Â Â Â Â  In 2001, the Legislature also made
significant revisions to the statute providing for compensation to persons
wrongfully imprisoned.Â  See Act of May 27, 2001, 77th Leg., R.S., ch.
1488, Â§ 1, 2001 Tex. Gen. Laws 5280, 5280-83 (codified at Tex. Civ. Prac. & Rem. Code Ann. ch.
103).Â  Those revisions included:

Â·Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
eliminating the requirement
that the defendant must have pleaded Ânot guiltyÂ to be eligible for
compensation;

Â 

Â·Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
eliminating the requirement
that a pardon is required before a defendant is eligible for compensation (instead
allowing compensation if the defendant is pardoned or if the defendant Âhas
been granted relief on the basis of actual innocenceÂ);

Â 

Â·Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
providing an administrative
procedure for compensation benefits of $25,000 per year of wrongful
imprisonment up to $500,000; and

Â 

Â·Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
increasing the damages cap
from $50,000 to $500,000 in a suit filed for compensation benefits.

Â 

Id.

Â Â Â Â Â Â Â Â Â  In 2003, the Legislature established a
crime laboratory accreditation process.Â  See Act of May 28, 2003, 78th
Leg., R.S., ch. 698, Â§ 4, 2003 Tex. Gen. Laws 2128, 2128-29 (codified at Tex. GovÂt Code Ann. Â§ 411.0205).Â  In
that same legislation, article 38.35 of the Code of Criminal Procedure (which
concerns ÂForensic Analysis of EvidenceÂ) was amended to provide that evidence
subjected to forensic analysis and testimony regarding that evidence is not
admissible in a criminal case if the analysis was performed at a laboratory not
accredited under section 411.0205.Â  See Act of May 28, 2003, 78th Leg.,
R.S., ch. 698, Â§ 3, 2003 Tex. Gen. Laws 2128, 2128 (codified at Tex. Code Crim. Proc. Ann. art.
38.35(d), (e)).

Â Â Â Â Â Â Â Â Â  In response to the difficulties at the
HPD crime lab, the Legislature enacted legislation in 2005 creating the Texas
Forensic Science Commission.Â  See Act of May 30, 2005, 79th Leg., R.S., ch.
1224, Â§ 1, 2005 Tex. Gen. Laws 3952, 3952-53 (codified at Tex. Code Crim. Proc. Ann. art. 38.01);
see also John Whitmire, Senate
District 15 Legislative Report, at 3 (Fall 2005); Steve McVicker, Crime
Lab Watchdog Bill Sent to Perry, Houston
Chron., May 31, 2005, at B1.Â  The Forensic Science Commission was
created so Texas would have:

a process in place to conduct independent
external investigation into allegations of serious negligence or misconduct
substantially affecting the integrity of any forensic laboratory system,
medical examinerÂs office, coronerÂs office, law enforcement storage facility,
or medical facility in the state that processes criminal forensic science used
in criminal proceedings.

Â 

Sen. Comm. on Crim.
Justice, Bill Analysis, S.B. 1263,
79th Leg., R.S. (2005).[22]

Â Â Â Â Â Â Â Â Â  The 79th Legislature also acted to
enhance the crime laboratory accreditation process.Â  See Act of May 30,
2005, 79th Leg., R.S., ch. 1224, Â§ 3, 2005 Tex. Gen. Laws 3952, 3954-55
(amending Tex. GovÂt Code Ann. Â§ 411.0205).

Â Â Â Â Â Â Â Â Â  PenaÂs case does not involve DNA
evidence.Â  Nonetheless, there have been at least three different occasions in the
last eight years in which more than 150 persons in Texas have been either wrongfully
accused of crimes involving narcotics or the accusations were called into
question because of tainted evidence.

Â Â Â Â Â Â Â Â Â  Forty-six men and women were falsely
arrested for selling narcotics in Tulia, Texas in 1999, and thirty-eight of
them were convicted.Â  Melissa Drosjack, Perry Signs Bill to Free Tulia 13,
 Houston Chron., June 3, 2003, at A13.Â  In response to the Tulia
scandal, the Texas Legislature unanimously approved an amendment to article
11.65 of the Code of Criminal Procedure allowing thirteen of those arrested and
convicted to be released on bond pending resolution of their habeas
applications.[23]Â  Id.; Sen. Comm. on Crim. Justice, Bill
Analysis, S.B. 1948, 77th Leg., R.S. (2003).Â  Governor Perry ultimately pardoned
thirty-five of the thirty-eight who were convicted.Â  Polly Ross Hughes, Perry
Pardons 35 in Tulia Sting, Houston Chron., Aug. 23, 2003, at A1.

Â Â Â Â Â Â Â Â Â  In November 2000, twenty-eight men and
women were arrested in Hearne, Texas for possessing or distributing crack
cocaine based on alleged transactions with a confidential informant.Â  James
Kimberly, ACLU to File Suit, Alleges Racism in Hearne Drug Bust, Houston Chron., Nov. 1, 2002, at A1; see
also Kelly v. State, 151 S.W.3d 683 (Tex. App.ÂWaco 2004, no pet.).[24]Â 
The prosecutor ultimately dismissed the charges in seventeen of these cases
because of Âtainted evidence.ÂÂ  Tainted Evidence Blamed as 17 Drug Cases
Dropped, Houston Chron., Apr. 5, 2001, at A28.

Â Â Â Â Â Â Â Â Â  And prosecutors in Dallas County had to dismiss eighty-six drug cases filed in connection with arrests dating from
2000-2001 after it was discovered that the alleged controlled substances were
actually composed of mostly gypsum.Â  Arrests May Cost Millions/Dallas Faces
Suits in False Drug Busts, Houston Chron., Oct. 10., 2002, at A38.Â 
ÂNearly half of all purported cocaine Dallas police seized [in 2001] was finely
crushed Sheetrock, while one-fourth of the methamphetamine turned out to be
composed of gypsum, the main ingredient in Sheetrock.ÂÂ  Cocaine Tips Turn
Out to Be a Real Snow Job, Houston Chron., Jan. 7, 2002, at A19.

Â Â Â Â Â Â Â Â Â  This review of the last two decades
demonstrates the import of preserving potentially exculpatory evidence,
particularly in cases involving some form of laboratory analysis. Â Indeed, the
unique problems seen in Texas during the last decade provide considerable
impetus toward a conclusion that Âfundamental fairnessÂ demands preservation of
potentially exculpatory evidence.[25]Â  See
Cobb, 85 S.W.3d at 268 (Texas Constitution should be interpreted more
broadly Âonly when unique aspects of Texas history, jurisprudence, or law support
that separate interpretationÂ).

E. Summary

Â Â Â Â Â Â Â Â Â  The historical backdrop for the Due
Course of Law provision in the Texas Constitution demonstrates that the framers
intended for this provision to be interpreted consistent with the Due Process
Clause of the federal constitution.Â  However, there is no clear consensus among
our sister states regarding whether Youngblood should apply to state
constitutional due process claims.Â  The Texas experience in the last decade and
the national experience of the last two decades reinforces the concerns
expressed by those twelve states which have determined that the Youngblood
standard is not adequate to address the loss or destruction of potentially
exculpatory evidence.

[C]oncern about the injustice that results from
the conviction of an innocent person has long been at the core of our criminal
justice system.Â  That concern is reflected, for example, in the Âfundamental
value determination of our society that it is far worse to convict an innocent
man than to let a guilty man go free.Â

Â 

Schlup v. Delo, 513 U.S. 298, 325, 115 S. Ct. 851, 866, 130 L. Ed. 2d 808 (1995)
(quoting In re Winship, 397 U.S. 358, 372, 90 S. Ct. 1068, 1077, 25 L. Ed.
2d 368 (1970) (Harlan, J., concurring)).

Â Â Â Â Â Â Â Â Â  Therefore, we join those twelve states
and hold that, under the Due Course of Law provision of article I, section 19,
the State has a duty to preserve material evidence which has apparent
exculpatory value, encompassing both exculpatory evidence and evidence that is
potentially useful to the defense.

F. Appropriate Standard

Â Â Â Â Â Â Â Â Â  The states which have adopted a
different standard than Youngblood apply various balancing tests to
determine whether the loss or destruction of potentially exculpatory evidence violates
a defendantÂs right to due process under those statesÂ respective constitutions.Â 
See Daniel R. Dinger, Should Lost Evidence Mean a Lost Chance to
Prosecute?: State Rejections of the United States Supreme Court Decision in Arizona v. Youngblood, 27 Am. J. Crim. L. 329,
356-61 (2000).

Â Â Â Â Â Â Â Â Â  The largest number of these states employs
the balancing test enunciated by the Delaware Supreme Court in Deberry v.
State or a similar balancing test.Â  457 A.2d 744, 752 (Del. 1983) (cited
with approval by Lolly v. State, 611 A.2d 956, 960 (Del. 1992)).Â  In Deberry,
the Delaware Supreme Court determined that the following three factors should
be weighed to decide whether a defendantÂs state constitutional due process
rights have been violated by the StateÂs failure to preserve potentially
exculpatory evidence:

(1)Â Â Â Â Â Â Â Â Â Â Â Â 
would the evidence have been
subject to discovery or disclosure;

Â 

(2)Â Â Â Â Â Â Â Â Â Â Â Â 
if so, did the state have a
duty to preserve the evidence; and

Â 

(3)Â Â Â Â Â Â Â Â Â Â Â Â 
if there was a duty to
preserve, was that duty breached, and what consequences should flow from the
breach.

Â 

See id.
at 750.Â  With regard to the third element of this analysis, the Court observed:

[W]e draw a balance between the
nature of the StateÂs conduct and the degree of prejudice to the accused. Â The
State must justify the conduct of the police or prosecutor, and the defendant
must show how his defense was impaired by loss of the evidence. Â In general
terms, the court should consider Â(1) the degree of negligence or bad faith
involved, (2) the importance of the lost evidence, and (3) the sufficiency of
the other evidence adduced at the trial to sustain the conviction.Â Â United
States v. Loud Hawk, 628 F.2d 1139, 1152 (9th Cir. 1979) (Kennedy, J.,
concurring) (quoting United States v. Higginbotham, 539 F.2d 17, 21 (9th
Cir. 1976)).

Â 

Id.
at 752.Â  Four other states have adopted a virtually identical balancing test. Â See
Gurley v. State, 639 So. 2d 557, 566-67 (Ala. Crim. App. 1993); State v.
 Ferguson, 2 S.W.3d 912, 917 (Tenn. 1999); State v. Delisle, 648
A.2d 632, 642-43 (Vt. 1994); State v. Osakalumi, 461 S.E.2d 504, 511-12
(W. Va. 1995).

Â Â Â Â Â Â Â Â Â  The various balancing tests employed
by the other seven states which have rejected the Youngblood standard
are substantially similar.

The stateÂs good or bad faith in failing to
preserve the videotape is relevant to determining the appropriate sanction. We
look to the degree of culpability on the part of the state, the importance of
the evidence lost, the prejudice suffered by the accused, and the evidence of
guilt adduced at the trial or hearing.

Â 

Thorne v. DepÂt of Pub. Safety, 774 P.2d 1326, 1331 (Alaska 1989).

[W]e weigh the reasons for the
unavailability of the evidence, the materiality of the missing evidence, the
likelihood of mistaken interpretation of it by witnesses or the jury and the
prejudice to the defendant. Â The first factor scrutinizes the stateÂs
involvement, and the remaining three examine the impact on the trial.

Â 

State v. Estrella, 893 A.2d 348, 364 (Conn. 2006) (citation omitted).

Â Â Â Â Â Â Â Â Â  The balancing test in Hawaii focuses on: (1) whether the state acted in bad faith in losing or destroying the
evidence; (2) Âthe favorableness of the evidenceÂ; and (3) Âthe prejudice
suffered by the defendant as a result of its loss.ÂÂ  State v. Matafeo,
787 P.2d 671, 673 (Haw. 1990).

Â Â Â Â Â Â Â Â Â  The Supreme Court of Idaho
endorsed an approach which is:

cognizant of the degree and weight
of the evidence accumulated against the defendant as well as the degree of
culpability of the State in failing to preserve material evidence. Â Indeed, a
strong line of cases do more than just recognize the relative strengths and
weaknesses of those variables, but actively balance the magnitude of the StateÂs
failure to perform its duty to preserve evidence against the degree of
prejudice thereby sustained by the defendant.

Â 

State v. Fain, 774 P.2d 252, 265 (Idaho 1989).

When potentially exculpatory
evidence is lost or destroyed, a balancing test is employed to determine the
appropriateness and extent of remedial action. The courts must weigh the
culpability of the Commonwealth, the materiality of the evidence and the
potential prejudice to the defendant.

Â 

Commonwealth v. Phoenix, 567 N.E.2d 193, 196 (Mass. 1991).

Â Â Â Â Â Â Â Â Â  Once a defendant
demonstrates that the State has failed to preserve apparently relevant
evidence, the State has the burden of showing that it acted in good faith, in
the sense that it had no intent to prejudice the defendant, and that it also
acted without culpable negligence, which we have defined as Âless than gross
negligence but more than ordinary negligence.ÂÂ  If the State carries its
burden, to claim relief the defendant must Âdemonstrate[ ] that the lost
evidence was material, to the degree that its introductionÂ would probably
have led to a verdict of not guilty, and that its loss prejudiced [the
defendant] by precluding the introduction of evidence that would probably have
led to a verdict in his favor.

Â 

State v. Smagula, 578 A.2d 1215, 1217 (N.H. 1990)
(citations omitted).

New Mexico has adopted a three-part test to
determine whether deprivation of evidence violates a criminal defendantÂs right
to due process and requires suppression of the evidence. Â With regard to each
item of evidence, the district court must determine whether:


1) The State either breached some duty or intentionally deprived the defendant
of evidence;

Â 
2) The improperly ÂsuppressedÂ evidence [was] material; and

Â 
3) The suppression of [the] evidence prejudiced the defendant.

Â 

State v. Hill, 125 P.3d 1175, 1180 (N.M. Ct. App.
2005) (citing State v. Chouinard, 634 P.2d 680, 683 (N.M. 1981)); accord
State v. Ware, 881 P.2d 679, 682-83 (N.M. 1994).

Â Â Â Â Â Â Â Â Â  One commentator concludes
that the ÂDelaware/TennesseeÂ approach represents that best means to uphold a
defendantÂs right to a fundamentally fair trial without placing an inordinate
burden on the State.

[T]he balancing approach adopted by Delaware, Tennessee, and others is clearly the better approach. Â The balancing approach is
the better approach because a fundamentally unfair trial is less likely to
occur under that approach than under the Youngblood bad faith test. Â Further,
under the balancing approach, courts have more flexibility in upholding and
reversing convictions when the interests of justice require that it [sic] do
so.Â  That flexibility is missing from the Youngblood approach. Â Finally,
the balancing approachÂa more Âeffective way[ ] of protecting the rights of the
individual while promoting efficient enforcement of our criminal lawsÂÂis
superior because it is more fair to defendants, but not less fair to the State,
than the Youngblood approach, and it is just as easy to apply. Â Under
the balancing approach, more so than under Youngblood, a court is
permitted [to] engage in Âa search for truth, not an adversary game.ÂÂ  For this
reason alone, the balancing approach is the superior approach.

Â 

Dinger, supra, 27 Am. J.
Crim. L. at 383 (quoting Miranda v. Arizona, 384 U.S. 436, 467, 86 S. Ct. 1602, 1624, 16 L. Ed. 2d 694 (1966); United States v. Perry, 471
F.2d 1057, 1063 (D.C. Cir. 1972)).Â  We agree with this analysis and adopt the
Delaware/Tennessee approach, stated above, as the standard for claims arising
under article I, section 19 of the Texas Constitution.Â  See Deberry, 457
A.2d at 750-52; see also Gurley, 639 So. 2d at 566-67; Ferguson,
2 S.W.3d at 917; Delisle, 648 A.2d at 642-43; Osakalumi, 461
S.E.2d at 511-12.

G. Application

1. Was Evidence Subject to Discovery or Disclosure?


Â Â Â Â Â Â Â Â Â  Â[A] criminal defendant
has a right to inspect evidence indispensable to the StateÂs case because that
evidence is necessarily material to the defense of the accused.ÂÂ  McBride v.
State, 838 S.W.2d 248, 251 (Tex. Crim. App. 1992); accord Nowling v. State,
801 S.W.2d 182, 185 (Tex. App.ÂHouston [14th Dist.] 1990, pet. refÂd); see
also Tex. Code Crim. Proc. Ann.
art. 39.14(a) (Vernon Supp. 2006)) (defendant has right to discovery of Âtangible
things not privileged, which constitute or contain evidence material to any
matter involved in the action and which are in the possession, custody or
control of the State or any of its agenciesÂ).Â  In a marihuana case, the alleged
marihuana is necessarily Âindispensable to the StateÂs case,Â and the defendant
has Âa right to inspect that evidence.ÂÂ  See McBride, 838 S.W.2d at 251;
Nowling, 801 S.W.2d at 185.

2. Did the State Have a Duty to
Preserve?

Â Â Â Â Â Â Â Â Â  The plant material which
was destroyed in PenaÂs case was material evidence.Â  Id.Â  Yet because it
was not independently tested, the evidence was merely potentially useful.Â 
Nothing more may be said of the missing plant material than that it could have
been subjected to an independent test.Â  See Illinois v. Fisher, 540 U.S. 544, 547, 124 S. Ct. 1200, 1202, 157 L. Ed. 2d 1060 (2004)
(unpreserved evidence was potentially useful because the defense could have
subjected it to a fifth test).Â  Also, given the materialÂs complete destruction, it is clear that
Pena was unable to obtain comparable evidence by other reasonably available
means.Â  See Trombetta, 467 U.S. at 489, 104 S. Ct. at 2534.Â  Finally, it
seems logical to impose a duty of preservation where the evidence in question
is Âindispensable to the StateÂs caseÂ and the defendant has Âa right to
inspect that evidence.ÂÂ  See McBride, 838 S.W.2d at 251; Nowling,
801 S.W.2d at 185.Â  Therefore, the State had a duty to preserve the plant
material, and because it was not preserved, the State has breached this duty.




3. What Consequences Should Flow
from this Breach?

(a) Degree of Negligence

Â Â Â Â Â Â Â Â Â  We now turn to the
consequences of this breach.Â  It is evident from the record that the plant
material was not destroyed with the intent to deprive Pena of access to it.Â 
The destroyed plant material and accompanying missing files were most likely
the result of two acts of negligence.Â  Mott testified that the files were most
likely lost during the labÂs relocation and that the plant material was
destroyed because a destruction order was received.

(b) Importance of Lost Evidence

Â Â Â Â Â Â Â Â Â  Because the plant material
was the sole basis for PenaÂs arrest and prosecution, it was of paramount importance
and became more so after the files documenting its testing were lost.Â 
Consequently, the lab report, exclusively relied upon at trial, is the only
evidence recording that the destroyed plant material was tested, and it stands
unsupported by documentation and unverified by human memory.

(c) Sufficiency of Other Evidence

Â Â Â Â Â Â Â Â Â  Regarding the third
factor, the sufficiency of the other evidence, the photographic evidence of the
plant material and AsbyÂs testimony would support a finding that Pena possessed
marihuana on the occasion in question.Â  See Ward v. State, 659 S.W.2d
643, 644-45 (Tex. Crim. App. 1983) (finding that despite no chemical analysis,
officerÂs testimony that leafy substance was marihuana was sufficient).Â  However,
Ward is a case in which the defendant was charged with possessing the
smallest prosecutable quantity of marihuana, less than two ounces.Â  See id.
at 643.Â  Thus, it was not important in that case to have evidence regarding the
quantity of the marihuana the defendant was found to be in possession of.Â 
Conversely, even assuming the material seized from PenaÂs van was marihuana, evidence
of quantity is important to determine whether he should be punished for the
commission of a state jail felony or a third degree felony.Â  See Tex. Health & Safety Code Ann. Â§
481.121(b)(3), (4) (Vernon 2003).Â  Photographs and officer testimony are far
less probative on this element of the StateÂs case.

4. Summary

Â Â Â Â Â Â Â Â Â  Pena had a right to
inspect the plant material and it was subject to discovery.Â  The State had a
duty to preserve this evidence, which the State breached.Â  Regarding the
consequences which should flow from this breach, the StateÂs negligence was arguably
slight.Â  However, the other factors, the importance of the lost evidence and
the sufficiency of the remaining evidence, weigh heavily in PenaÂs favor.Â  Therefore,
we hold that Pena was denied due course of law by the StateÂs destruction of
the plant material and the DPS lab file documenting its testing and subsequent
destruction.

H. Harm

Â Â Â Â Â Â Â Â Â  Having found a
constitutional violation, we must next determine whether this error requires
reversal.Â  Under Rule of Appellate Procedure 44.2(a), such an error requires
reversal Âunless the court determines beyond a reasonable doubt that the error
did not contribute to the conviction or punishment.ÂÂ  Tex. R. App. P. 44.2(a); see Pope v. State, 161 S.W.3d
114, 121 (Tex. App.ÂFort Worth 2004), affÂd, 207 S.W.3d 352 (Tex. Crim.
App. 2006); Moore v. State, 143 S.W.3d 305, 323 (Tex. App.ÂWaco 2004,
pet. refÂd); Fox v. State, 115 S.W.3d 550, 563 (Tex. App.ÂHouston [14th Dist.] 2002, pet. refÂd).

Â Â Â Â Â Â Â Â Â  Here, the error impacted
the determination of PenaÂs guilt because it affected his ability to prove his
contention that the plant material was something other than marihuana or that
it amounted to a quantity less than charged in the indictment.Â  Cf. Nowling,
801 S.W.2d at 184-85.Â  Therefore, we cannot say beyond a reasonable doubt that
the error did not affect PenaÂs conviction or punishment.

I. Appropriate Remedy

Â Â Â Â Â Â Â Â Â  There are generally three
recognized remedies for the loss or destruction of evidence: (1) dismissal; (2)
exclusion of related evidence; or (3) an adverse inference instruction.

Â Â Â Â Â Â Â Â Â  A dismissal for this type
of error is generally disfavored.Â  See Fain, 774 P.2d at 266.Â  The Court
of Criminal Appeals of Alabama suggests that dismissal is an appropriate
sanction only if the State acted in bad faith when it destroyed the evidence at
issue.Â  Gurley, 639 So. 2d at 569.Â  In New Mexico, Â[d]ismissal is not a
proper remedy without a showing that the defendant Âwill be deprived of a fair
trial if Â .Â  .Â  . Â tried without the missing evidence.ÂÂ  Hill, 125 P.3d
at 1181 (quoting State v. Bartlett, 789 P.2d 627, 629 (N.M. Ct. App.
1990)).Â  The Supreme Judicial Court of Massachusetts has similarly held that
dismissal may be an appropriate remedy, even when the state does not act in bad
faith, if the loss or destruction of the potentially exculpatory evidence Âis
nonetheless so critical to the defense as to make a criminal trial
fundamentally unfair.ÂÂ  Commonwealth v. Henderson, 582 N.E.2d 496, 497 (Mass. 1991) (quoting Youngblood, 488 U.S. at 61, 109 S. Ct. at 339 (Stevens, J.,
concurring)).

Â Â Â Â Â Â Â Â Â  Another potential remedy
is the exclusion of evidence related to the lost or destroyed evidence.Â  See
Gurley, 639 So. 2d at 569; Commonwealth v. Willie, 510 N.E.2d 258,
263 (Mass. 1987); Chouinard, 634 P.2d at 684.Â  In PenaÂs case, this
would entail the exclusion of MottÂs testimony and the lab report, which would present
a substantial hurdle to PenaÂs prosecution on retrial.

Â Â Â Â Â Â Â Â Â  Finally, most courts
authorize the use of an adverse inference instruction as the appropriate
remedy.Â  See Gurley, 639 So. 2d at 569; Thorne, 774 P.2d at 1331;
Lolly, 611 A.2d at 961-62 & n.6; Fain, 774 P.2d at 266; Willie,
510 N.E.2d at 263; Chouinard, 634 P.2d at 684; Ferguson, 2 S.W.3d
at 917 & n.11; State v. Paynter, 526 S.E.2d 43, 52 (W. Va. 1999).

Â Â Â Â Â Â Â Â Â  Under the circumstances of
this case, we hold that an adverse inference instruction is the appropriate
remedy.[26]Â 
We provide two examples for the trial court to consider as it crafts an
appropriate instruction for PenaÂs case.

Â Â Â Â Â Â Â Â Â  The Supreme Court of Idaho
recommended the following instruction in a case in which a pathologist
discarded swabs containing fluid samples from the victimÂs body after testing
them.

You may take note of the fact that
the state had obtained bodily fluid samples from the body of the victim, that
such samples are, as a matter of law, material evidence in that scientific
tests are available which may exclude an individual from that class of persons
who could have committed the crime, that the state lost or destroyed the
samples, and that the defendant therefore did not have an opportunity to
conduct such tests. The fact that the state lost or destroyed the samples does
not, in itself, require that you acquit the defendant. Â It is, however, one
factor for you to consider in your deliberations.

Â 

Fain, 774 P.2d at 266.

Â Â Â Â Â Â Â Â Â  By contrast, the Supreme
Court of Tennessee endorsed the following instruction in a case in which the
police inadvertently recorded over a videotape depicting a defendant performing
field sobriety tests.

The State has a duty to gather,
preserve, and produce at trial evidence which may possess exculpatory value. Â Such
evidence must be of a nature that the defendant would be unable to obtain
comparable evidence through reasonably available means. Â The State has no duty
to gather or indefinitely preserve evidence considered by a qualified person to
have no exculpatory value, so that an as yet unknown defendant may later
examine the evidence.


If, after considering all of the proof, you find that the State failed to
gather or preserve evidence, the contents or qualities of which are in issue
and the production of which would more probably than not be of benefit to the
defendant, you may infer that the absent evidence would be favorable to the
defendant.

Â 

Ferguson, 2 S.W.3d at 917 n.11.

Â Â Â Â Â Â Â Â Â  We do not endorse either
of these as the appropriate instruction for PenaÂs case.Â  Rather, we offer them
for the assistance of the trial court in this emerging area of law in the event
of a retrial.

IV. Conclusion

Â Â Â Â Â Â Â Â Â  The admission of MottÂs
testimony and the DPS lab report without an accompanying instruction violated
PenaÂs right to due course of law under article I, section 19 of the Texas
Constitution.Â  Therefore, we sustain PenaÂs first issue and do not reach his
remaining issues.

We reverse the judgment and remand
this cause to the trial court for further proceedings consistent with this
opinion.

Â 




Â 

Â 

FELIPE REYNA

Justice

Â 

Before Chief Justice
Gray,

Justice
Vance, and

Justice
Reyna

(Chief
Justice Gray dissenting)[27]

Reversed and remanded

Opinion delivered and
filed May 2, 2007

Publish

[CRPM]









[1]
Â Â Â Â Â Â Â Â Â  PenaÂs trial counsel suggested
in his cross-examination of Asby that Pena had informed Asby Âthat he wanted
not only to have yaÂll test it but that he wanted to test it, too.ÂÂ  PenaÂs
counsel was reviewing the offense report as he questioned Asby.





[2]
Â Â Â Â Â Â Â Â Â  This Court raised this issue sua
sponte on original submission.Â  See Pena v. State, 166 S.W.3d 274
(Tex. App.âWaco 2005), vacated
on other grounds, 191 S.W.3d 133 (Tex. Crim. App. 2006).Â  The Court of
Criminal Appeals reaffirmed that an appellate court may address unassigned
error but remanded this appeal so the parties could have an opportunity to
brief this issue.Â  See Pena, 191 S.W.3d at 136-38.





[3]
Â Â Â Â Â Â Â Â Â  Some of these states had
distinct open courts/remedies provisions and provisions governing the rights of
the accused which each provided a due process protection similar to that found
in the Magna Carta.

Â 





[4]
Â Â Â Â Â Â Â Â Â  See Ill. Const. of 1818, art. VIII, Â§ 8; Md. Declaration of Rights of 1776, art.
XXI; N.Y. Const. of 1777, art.
XIII; N.C. Declaration of Rights
of 1776, art. XII; Tenn. Const.
of 1796, art. XI, Â§ 8; see also Nw.
Territory Ordinance of 1787, Â§ 14, art. II.

Â 





[5]
Â Â Â Â Â Â Â Â Â  See Del. Const. of 1831, art. I, Â§ 7; Ky. Const. of 1799, art. X, Â§ 10; Me. Const. of 1820, art. I, Â§ 6; Mass. Const. of 1780, pt. I, art. XII; Mo. Const. of 1820, art. XIII, Â§ 9; N.H. Const. of 1784, pt. I, art. 15; Pa. Const. of 1790, art. IX, Â§ 9; Vt. Const. of 1786, ch. I, art. XI; Va. Declaration of Rights of 1776, Â§ 8.

Â 





[6]
Â Â Â Â Â Â Â Â Â  See Ala. Const. of 1819, art. I, Â§ 14; Conn. Const. of 1818, art. I, Â§ 12; Del. Const. of 1831, art. I, Â§ 9; Ind. Const. of 1816, art. I, Â§ 11; Me. Const. of 1820, art. I, Â§ 19; Miss. Const. of 1832, art. I, Â§ 14; Ohio
Const. of 1802, art. VIII, Â§ 7; Pa.
Const. of 1790, art. IX, Â§ 11; Tenn.
Const. of 1835, art. I, Â§ XVII; see also Md. Declaration of Rights of 1776, art. XVII (Âevery freeman,
for any injury done him in his person or property, ought to have remedy, by the
course of the law of the landÂ).

Â 





[7]
Â Â Â Â Â Â Â Â Â  See Ala. Const. of 1819, art. I, Â§ 10; Conn. Const. of 1818, art. I, Â§ 9; Miss. Const. of 1832, art. I, Â§ 10.

Â 





[8]
Â Â Â Â Â Â Â Â Â  See Dorman v. State, 34 Ala. 216, 1859 WL 713, at *13 (1859); In re Clark, 65 Conn. 17, 31 A. 522, 526-27
(1894); Wilson v. Balt. & Phila. R.R. Co., 5 Del. Ch. 524,
1884 WL 1743, at *8 (1884); Rhinehart v. Schuyler, 7 Ill. (2 Gilm.) 473,
1845 WL 3964, at *31 (1845); Campbell v. Dwiggins, 83 Ind. 473, 1882 WL
6936, at *5 (1882); Doe ex dem. Gaines v. Buford, 31 Ky. (1 Dana) 481,
1833 WL 2531, at *15 (1833); In re Opinion of the Justices, 58 Me. 590,
1871 WL 7826, at *3 (1871); Regents of the Univ. of Md. v. Williams, 9
G. & J. 365, 1838 WL 1372, at *30 (Md. 1838); Jones v. Robbins, 74
Mass. (8 Gray) 329, 342-43, 1857 WL 5869, at *10 (1857); Griffin v. Mixon,
38 Miss. 424, 1860 WL 3138, at *14 (1860); State v. Stein, 2 Mo. 67,
1828 WL 1622, at *1 (1828); Mayo v. Wilson, 1 N.H. 53, 1817 WL 456, at
*3 (1817); Taylor v. Porter & Ford, 4 Hill 140 (N.Y. Sup. Ct. 1843); State v. Moss, 47 N.C. (2 Jones) 66, 1854 WL 1395, at *2 (1854); Ex
parte Bushnell, 9 Ohio St. 77, 89, 1859 WL 2 (1859); PalairetÂs Appeal,
67 Pa. 479, 1871 WL 10920, at *5 (1871); Zylstra v. Corp. of Charleston,
1 S.C.L. (1 Bay) 382, 1794 WL 306, at *5 (1794); State v. Staten, 46 Tenn. (6 Cold.) 233, 1869 WL 2543, at * 4 (1869); Quimby v. Hazen, 54 Vt. 132, 1881 WL 7830, at *1 (1881); Commonwealth v. Byrne, 61 Va. (20 Gratt.) 165,
1871 WL 4845, at *13 (1871).

Â 





[9]
Â Â Â Â Â Â Â Â Â  The delegates who assembled at
Washington-on-the-Brazos Âhad relatively little time for deliberation or subtle
refinements; they adopted the Constitution in what has been described as a
Âstate of panic.ÂÂÂ  John Cornyn, The Roots of the Texas Constitution:
Settlement to Statehood, 26 Tex.
Tech. L. Rev. 1089, 1120 (1995).Â  This is evident from the haste with
which the delegates adopted a declaration of independence and a constitution.Â 
On the first day of the Convention, March 1, 1836, the delegates elected
Richard Ellis of Pecan Point as President of the Convention.Â  Journals of the
Convention of the Free, Sovereign and Independent People of Texas, in General
Convention Assembled, reprinted in 1 H.P.N. Gammel, The Laws of Texas 1822-1897, at
823, 824-25 (Austin, Gammel Book Co. 1898).Â 
President Ellis appointed a committee of 5 to draft a declaration of
independence.Â  Id. at 825-26.Â  The Convention approved the Declaration
drafted by that committee the next day.Â  Id. at 837.Â  Immediately
preceding the report on the Declaration of Independence, President Ellis
appointed a committee of 21 to draft a constitution.Â  Id. at 834.Â  This
committee presented their proposed constitution one week later.Â  Id. at 859.





[10]
Â Â Â Â Â Â Â Â  Although the Texians paid much
attention to the Louisiana Constitution of 1845, that constitution did not have
any type of due process provision.Â  Louisiana did not adopt a constitutional
due process provision until its 1864 Constitution.Â  See La. Const. of 1864, tit. VII, art. 110.

Â 





[11]
Â Â Â Â Â Â Â Â  Michigan was the third of these
states, but the Michigan Constitution of 1835 did not have a due process
provision.Â  Such a provision first appeared in the Michigan Constitution of
1850.Â  See Mich. Const. of
1850, art. VI, Â§ 32.Â  Michigan, like virtually all the other states, considered
the terms Âthe law of the land,Â Âdue
process,Â and Âdue course of lawÂ to be synonymous.Â  See Sears v. Cottrell,
5 Mich. 251, 1858 WL 4478, at *2 (Mich. 1858).





[12]Â Â Â Â Â Â Â Â Â Â Â Â  The Court of Criminal Appeals often relies on
the decisions of the Supreme Court of Texas when addressing matters of state
constitutional law.Â  See, e.g., Luquis v. State, 72 S.W.3d 355, 365
(Tex. Crim. App. 2002); Ex parte Mitchell, 977 S.W.2d 575, 580 (Tex.
Crim. App. 1997); Clewis v. State, 922 S.W.2d 126, 131 (Tex. Crim. App.
1996).Â  The Supreme Court reciprocates.Â  See Davenport v. Garcia, 834
S.W.2d 4, 14 (Tex. 1992) (orig. proceeding) (ÂWe give thoughtful consideration
to that courtÂs analysis in part to avoid conflicting methods of constitutional
interpretation in our unusual system of bifurcated highest courts of appeal.Â);
see also Yanes v. Sowards, 996 S.W.2d 849, 852 (Tex. 1999) (per curiam).

Â 





[13]
Â Â Â Â Â Â Â Â  To be more precise, the
Fourteenth Amendment was not ratified until 1868, so it necessarily had no
influence on the drafting of TexasÂs earlier constitutions.Â  Rather, the Due
Process Clause of the Fifth Amendment was the comparable federal provision for
those documents.





[14]
Â Â Â Â Â Â Â Â Â Â Â  In a dissenting opinion, Judge Campbell criticized the majority for
finding a due process violation because Âthere is no evidentiary supportÂ for a
finding of bad faith.Â  Ex parte Brandley, 781 S.W.2d 886, 914-15 (Tex.
Crim. App. 1989) (Campbell, J., dissenting).

Â 





[15]
Â Â Â Â Â Â Â Â  Excluding this CourtÂs prior
decision in this case, which has been set aside.Â  See Pena, 166 S.W.3d at
281-82, vacated on other grounds, 191 S.W.3d 133 (Tex. Crim. App. 2006).

Â 





[16]
Â Â Â Â Â Â Â Â  See State v. Vickers, 885 P.2d 1086, 1093 (Ariz. 1994); Lee v. State, 942 S.W.2d 231, 234-35
(Ark. 1997); People v. Cooper, 809 P.2d 865, 886 (Cal. 1991); People
v. Danielly, 653 N.E.2d 866, 869-70 & n.1 (Ill. Ct. App. 1995); Terry
v. State, 857 N.E.2d 396, 406 n.8 (Ind. Ct. App. 2006); State v. Dulaney,
493 N.W.2d 787, 791-92 (Iowa 1992); State v. Finley, 42 P.3d 723, 728 (Kan. 2002); Collins v. Commonwealth, 951 S.W.2d 569, 572-73 (Ky. 1997); State v.
Anderson, 724 A.2d 1231, 1233-34 (Me. 1999); Patterson v. State, 741
A.2d 1119, 1128-30 (Md. 1999); People v. OÂDonnell, No. 182699, 1998 WL
2016617, at *1 (Mich. Ct. App. 1998) (per curiam) (not designated for
publication); State v. Smith, 157 S.W.3d 687, 690-91 (Mo. Ct. App. 2004);
State v. Davlin, 639 N.W.2d 631, 647 (Neb. 2002); State v. Hunt, 483
S.E.2d 417, 420-21 (N.C. 1997); State v. Caldwell, 607 N.E.2d 1096,
1098, 1101-03 (Ohio Ct. App. 1992); Ochoa v. State, 963 P.2d 583, 595
(Okla. Crim. App. 1998); Commonwealth v. Free, 902 A.2d 565, 569 (Pa. Super. Ct. 2006); State v. Vanover, 721 A.2d 430, 433 (R.I. 1998); State v.
Engesser, 661 N.W.2d 739, 754-56 (S.D. 2003); Mullins v. Commonwealth,
No. 1250-94-3, 1996 WL 343953, at *5 (Va. Ct. App. June 25, 1996) (not
designated for publication); State v. Wittenbarger, 880 P.2d 517, 523-24
(Wash. 1994); State v. Greenwold, 525 N.W.2d 294, 298 (Wis. Ct. App. 1994); Tortolito
v. State, 885 P.2d 864, 871-72 (Wyo. 1994), opinion withdrawn, 901
P.2d 387 (Wyo. 1995).

Â 





[17]
Â Â Â Â Â Â Â Â  See Gurley v. State, 639
So. 2d 557, 567 (Ala. Crim. App. 1993); Thorne v. DepÂt of Pub. Safety,
774 P.2d 1326, 1331 (Alaska 1989); State v. Estrella, 893 A.2d 348,
363-64 (Conn. 2006); Lolly v. State, 611 A.2d 956, 960Â  (Del. 1992); State
v. Matafeo, 787 P.2d 671, 673-74 (Haw. 1990); State v. Fain, 774
P.2d 252, 261-67 (Idaho), cert. denied, 493 U.S. 917, 110 S. Ct. 277,
107 L. Ed. 2d 258 (1989); Commonwealth v. Phoenix, 567 N.E.2d 193, 196
& n.1 (Mass. 1991); State v. Smagula, 578 A.2d 1215, 1217-18 (N.H.
1990); State v. Ware, 881 P.2d 679, 682-83 (N.M. 1994); State v. Ferguson, 2 S.W.3d 912, 916-17 (Tenn. 1999); State v. Delisle, 648 A.2d 632,
642-43 (Vt. 1994); State v. Osakalumi, 461 S.E.2d 504, 511-14 (W. Va. 1995).

Â 





[18]
Â Â Â Â Â Â Â Â  The states which have not decided
this issue are Colorado, Florida, Georgia, Louisiana, Minnesota, Mississippi, Montana, Nebraska, New York, Nevada, New Jersey, North Dakota, Oregon, South Carolina, and Utah.Â  At least one commentator contends that Minnesota adopted
a different standard in State v. Schmid, 487 N.W.2d 539, 541-42 (Minn.
Ct. App. 1992).Â  See Daniel R. Dinger, Should Lost Evidence Mean a
Lost Chance to Prosecute?: State Rejections of the United States Supreme Court
Decision in Arizona v. Youngblood, 27 Am.
J. Crim. L. 329, 356-57 (2000).Â  However, more recent Minnesota
decisions do not reflect the adoption of any independent state constitutional
standard.Â  See, e.g., State v. Heath, 685 N.W.2d 48, 55-56 (Minn. Ct.
App. 2004).

Â 





[19]
Â Â Â Â Â Â Â Â  It is noteworthy that the
decisions in eight of the twenty-four states (including Texas) which have
decided to follow Youngblood for state constitutional due process claims
were by intermediate appellate courts and not by the court of last resort in
those states.Â  Conversely, in the twelve states which have declined to follow Youngblood,
the highest court with criminal jurisdiction was the one that made the
decision.





[20]
Â Â Â Â Â Â Â Â  At the time of the article, ÂDNA
evidence ha[d] exonerated 12 Dallas County men since 2001, which is more than
all but two states, according to the Innocence Project.ÂÂ  Jeff Carlton, Dallas County DA Agrees to Let Group Review Cases for DNA Testing, Dallas
Morning News, Feb. 17, 2007.

Â 





[21]
Â Â Â Â Â Â Â Â  An independent audit of the HPD
crime lab uncovered Âdeficiencies ranging from potential contamination of
evidence to lack of basic recordkeeping.ÂÂ  Roma Khanna & Peggy OÂHare, More
Crime Lab Cases Earmarked for Review, Houston Chron., Feb. 7, 2003, at A1.





[22]
Â Â Â Â Â Â Â Â  The creation of this commission
also makes Texas eligible for federal funding under Âthe Justice for All
Act and the Paul Coverdell Forensic Sciences Improvement Grant Program.ÂÂ  Sen. Comm. on Crim.
Justice, Bill Analysis, S.B. 1263,
79th Leg., R.S. (2005).Â  Title IV of the federal Justice for All Act of 2004 is
known as the Innocence Protection Act of 2004 and, among other things, provides
for post-conviction DNA testing and for federal Âincentive grantsÂ for states
which provide post-conviction DNA testing.Â  See Justice for All Act of
2004, H.R. 5107, 108th Cong. Â§Â§ 401-432, Pub. L. No. 108-405, 118 Stat. 2260,
2278-93.

Â 





[23]
Â Â Â Â Â Â Â Â  With regard to the other three
who were convicted, one was on deferred adjudication community supervision and
not eligible for a pardon, while the other two were not eligible because of
convictions on other charges.Â  Polly Ross Hughes, Perry Pardons 35 in Tulia
Sting, Houston Chron., Aug. 23, 2003, at A1.





[24]
Â Â Â Â Â Â Â Â  Regina Kelly was one of those
arrested.Â  James Kimberly, ACLU to File Suit, Alleges Racism in Hearne Drug
Bust, Houston Chron., Nov. 1, 2002, at A1.Â  In this
Court, she sought to appeal the trial courtÂs denial of her motion for
disclosure of grand jury proceedings.Â  Kelly v. State, 151 S.W.3d 683,
684 (Tex. App.ÂWaco 2004, no pet.).Â  We concluded that we did not have
jurisdiction to hear such an appeal.Â  Id. at 686-87.

Â 





[25]
Â Â Â Â Â Â Â Â  DPS already recognizes the
importance of preserving such evidence.Â  Mott, who had been the supervisor for
the DPS lab in Waco for thirty-seven years, testified that this is the only
time in his recollection that the lab has lost or destroyed this type of
evidence before trial.





[26]
Â Â Â Â Â Â Â Â  There may be cases in which the
exclusion of evidence is an appropriate remedy, but not in a case like PenaÂs in
which exclusion of the evidence would be tantamount to an acquittal.Â Â  





[27]
Â Â Â Â Â Â Â Â Â Â Â  In reading the dissenting
opinionÂs selection from the Scriptures, we are reminded of the recent
observation of the Court of Criminal Appeals:

Â 

Â Â Â Â Â Â Â Â Â Â Â  First, the statement is unnecessary;
it contributes nothing to the legal issue before us. Â Second, and most
importantly, it is highly unprofessional. Â When a judge chastises other members
of the judiciary in this manner, it not only reflects poorly on the judge, it
undermines the integrity of the justice system. Â The words of Supreme Court
Justice Kennedy are particularly appropriate here:

Â 

The collegiality of the judiciary can be
destroyed if we adopt the habits and mannerisms of modern, fractious discourse.
Â Neither in public nor in private must we show disrespect for our fellow
judges. Â Whatever our failings, we embody the law and its authority. Â Disrespect
for the person leads to disrespect for the cause.

Â 

Â Â Â Â Â Â Â Â Â Â Â  If public respect for the judiciary
is to be maintained, it must begin from within.Â  

Â 

Ex parte Olivares,
202 S.W.3d 771, 773 (Tex. Crim. App. 2006) (quoting Anthony M. Kennedy, Judicial
Ethics and the Rule of Law, 40 St.
 Louis U. L.J. 1067, 1072
(1996)).